## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

_____

| | | |
|---|---|---|
| | § | |
| Old LC, Inc. (f/k/a Loot Crate, Inc.), Old | § | |
| LC Holdings, Inc., Old LCF, Inc., and | § | |
| Old LC Parent, Inc., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 22-_____  (BLS) |
| | § | |
| The Loot Company (f/k/a Loot Crate | § | |
| Acquisition LLC) and John Doe, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiffs Old LC, Inc.; Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc.

(collectively, "**Debtors**" or "**Plaintiffs**")[2] bring this action and respectfully allege as follows:

---

[1]     Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

[2]     Debtors were formerly named Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc.  Following the closing of the sale of substantially all of Debtors' assets completed in the administrative bankruptcy case, No. 19-11791, Debtors filed the necessary documentation in the applicable jurisdictions to change their corporate names and filed the *Notice of Changes of Debtors' Names and Case Caption* [D.I. 265] with the Court, all in accordance with the terms of the Sale (as defined below) and the order approving the same [D.I. 254].

## Nature of the Action

1.      Debtors bring this action to vindicate their rights and those of their bankruptcy estates against the company that purchased their assets in a Court-approved sale under Section 363 of the Bankruptcy Code.  Because the purchaser has repudiated its agreement to pay certain pre-petition sales taxes, which was a fundamental component of the purchase price in the transaction, Debtors seek specific performance, damages for breach of contract, equitable subordination, and related relief.  In addition, because the purchaser has made known its intent to transfer part or all the business it acquired from Debtors to one or more affiliates, evidently to protect itself against a judgment in favor of Debtors, Debtors seek to avoid and recover fraudulent transfers by the purchaser.

## Jurisdiction and Venue

2.      This adversary proceeding arises in and relates to Debtors' Chapter 11 cases (the "*Cases*").

3.      This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (E), (H), and (O).  To the extent any part of this adversary proceeding is determined not to be a core proceeding, Plaintiffs consent to the entry of final orders or judgments by the Court.

4.      Venue is proper under 28 U.S.C. § 1409 because this adversary proceeding arises under title 11 or arises in or relates to the Cases.

5.      The statutory predicates for the relief requested herein are found in §§ 105 and 510(c) of Title 11 of the United States Code (the "***Bankruptcy Code***"), as well as the Delaware

USA.602512244.6/YQM

Uniform Fraudulent Transfer Act and Federal Rules of Bankruptcy Procedure 6004, 6009, and 7001(1), (7), and (8).

## The Parties

8.      The Plaintiffs are Chapter 11 debtors and debtors-in-possession in the above-captioned jointly administered Cases.

9.      The Loot Company, f/k/a Loot Crate Acquisition LLC ("***Purchaser***") is a Delaware limited liability company with its principal offices located in New York, New York. Pursuant to Section 12.1 of the Purchase Agreement (defined below), Purchaser does not identify any address but instead lists the offices of Cooley LLP c/o Cathy Hershcopf and Robert Winning, 55 Hudson Yards, New York,  New York 10001.  Purchaser's registered agent is The Delaware Corporation Agency, Inc., 600 N. King Street, Suite 400, Wilmington, Delaware.

10.      Upon information and belief, and as further discussed below, Debtors have grounds to believe that multiple parties may have benefited from (and/or continuing to benefit from) certain conduct complained herein.  Likewise, upon information and belief, Purchaser does not have any direct employees but is instead directed by employees of an affiliate shared-services entity that houses employees that direct and oversee the operations of both Purchaser and other affiliated entities owned by Mr. Joel Weinshanker ("***Weinshanker***").  As such, upon further discovery, Debtors will amend this complaint to include all persons and parties that authorized, directed, aided and abetted, intentionally omitted disclosure of and/or falsely represented material information, and/or benefited from certain conduct complained herein.

## General Allegations

8.      On August 11 and 12, 2019 (the "***Petition Date***"), each of the Plaintiffs filed a voluntary petition with this Court under Chapter 11 of Title 11 of the United States Code (the

"*Bankruptcy Code*").  The Plaintiffs' Chapter 11 cases are consolidated for procedural purposes only and administered jointly.

9.      The Plaintiffs are authorized to continue to operate and manage their businesses and assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

10.     On October 1, 2019, the Court entered the *Order (A) Approving the Sale of Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [D.I. 254] (the "*Sale Order*").  The Sale Order approved the sale of substantially all of Debtors' assets to Purchaser pursuant to that certain Asset Purchase Agreement, dated as of September 27, 2019, and as amended (the "*Purchase Agreement*"), and the transaction closed as of October 1, 2019 (the "*Sale*").

11.     Pursuant to the Purchase Agreement, Debtors agreed to the transfer of substantially all of their assets in exchange for Purchaser's agreement to, among other things, pay the following Purchase Price: (i) $30 million payable in the form of a credit bid; (ii) a cash component described as the Budgeted Reserve; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]" (the "*Purchase Price*").  *See* Purchase Agreement § 2.6(a).

12.     Purchaser satisfied items (i) and (ii) of the Purchase Price.

13.     As a condition to closing and in order to satisfy item (iii) of the Purchase Price, Debtors and Purchaser entered into a funding commitment agreement at the closing of the Sale (the "*Sales Tax Funding Commitment*").  *See* Purchase Agreement §8.5(e).  A true and correct copy of the Sales Tax Funding Commitment, as amended and supplemented from time to time, is attached hereto as <u>Exhibit A</u>.

USA.602512244.6/YQM

14.     Pursuant to the Sales Tax Funding Commitment, and assuming the Payment Plan Protocols set forth in the Purchase Agreement and Sales Tax Funding Commitment were met, Purchaser committed to pay (directly or indirectly) the payments arising under payment plans Debtors finalized with various taxing jurisdictions on account of Debtors' pre-petition sales-tax obligations (the "***Payment Plans***").  *See* Purchase Agreement § 8.5(e)-(f).

15.     In order for the Payment Plans to become a funding obligation under the Purchase Agreement, the Payment Plans were to meet the criteria of the Payment Plan Protocols.  *See* Purchase Agreement § 8.5(b), (f).  The Payment Plan Protocols provided detailed parameters within which the Payment Plans had to remain.  Generally speaking, if the total amount owed to the state taxing authority was $50,000 or less, the Payment Plan could be comprised of payments over a period of up to six (6) months, but if the total amount owed to the state taxing authority was greater than $50,000 then the Payment Plan had to be comprised of payments over a thirty-six (36) month period and the total amount (excluding applicable interest and penalties) could be no greater than one hundred ten present (110%) of the estimated amount set forth on the Sales Taxes Schedule, which is attached to the Purchase Agreement at Schedule 8.5(a)(i).  *See* Purchase Agreement § 1.1(xx); Schedule 8.5(a)(i).

16.     Debtors originally had up to nine (9) months after the Sale closed to enter into Payment Plans pursuant to the Payment Plan Protocols.  Purchase Agreement §8.5(f).  Due to the COVID-19 pandemic, many state agencies shut down making it impossible for Debtors to finalize Payment Plans with those states.  Even with the hurdles associated with the COVID-19 pandemic, Debtors were able to finalize Payment Plans with all but four (4) states' taxing authorities prior to expiration of the original nine (9) month deadline.  At Debtors' request, Purchaser provided

USA.602512244.6/YQM

Debtors a short extension to enter into Payment Plans with the remaining state taxing authorities. *See* Amendment of Section 8.5(f) of the Purchase Agreement.[3]

17.    In accordance with the Purchase Agreement, the Sales Tax Funding Commitment, and the *Court's Order Granting Motion of Debtors for Omnibus Procedures By Which The Debtors Will Be Authorized to Negotiate and Settle Certain Tax Claims* [D.I. 369], Debtors and their professionals negotiated with twenty nine (29)[4] state taxing authorities.

18.    After expending an inordinate amount of time and resources towards finalizing the Payment Plans, Debtors were able to include twenty six (26) Payment Plans as additional funding obligations under the Sales Tax Funding Commitment. *See* Purchase Agreement §8.5; Sales Tax Funding Commitment §1.  The Payment Plans that became additional funding obligations under the Sales Tax Funding Commitment are the following taxing jurisdictions: Alabama, Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Nebraska, New York, North Carolina, Pennsylvania, Texas, Utah, Vermont, Washington, and Wisconsin.

19.    The twenty six (26) Payment Plans totaled more than four million ($4,000,000) in additional funding obligations under the Sales Tax Funding Commitment; most of these amounts were being paid over time by the Purchaser pursuant to the Sales Tax Funding Commitment.

---

[3]    The Amendment of Section 8.5(f) of the Purchase Agreement (the "***Amendment***") lists six (6) states for which Debtors were to receive an extension.  This is because at the time Debtors began negotiating the Amendment, there were six (6) states remaining; however, upon execution of the Amendment, Debtors had finalized Payment Plans with two (2) of those six (6) states.

[4]    This number is larger than the number of Payment Plans the Debtor ultimately entered into. This is because Debtors were unsuccessful in their attempts to enter into a Payment Plan with South Carolina and during Debtors' negotiations with North Dakota and New Jersey, they determined no sales taxes were owed to either taxing jurisdiction.

USA.602512244.6/YQM

20.     Accordingly, pursuant to Section 8.5 of the Purchase Agreement and Section 1 of the Sales Tax Funding Commitment, Purchaser "commit[ted] to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment obligations of the [Debtors] . . . as such individual payments [became] due under the Payment Plans." Sales Tax Funding Commitment §1.

21.     To the extent that Purchaser elected to satisfy a Payment Plan by direct payment to the applicable taxing authority, Section 2 of the Sales Tax Funding Commitment required Purchaser to provide to Debtors written documentation evidencing such payment was made to the applicable state.

22.     Given the materiality of the Sales Tax Funding Commitment obligation as a condition to the Sale, Debtors specifically negotiated for the right of specific performance by which Debtors maintain the right to cause Purchaser to satisfy its obligations under the Sales Tax Funding Commitment, plus the costs and expenses incurred by Debtors in seeking such relief. Sales Tax Funding Commitment § 4.

23.     Debtors fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent to Purchaser's obligations have been satisfied.

**Purchaser's Breach of the Purchase Agreement and Sales Tax Funding Commitment**

24.     Between the closing of the Sale and approximately November 1, 2021, Debtors and Purchaser maintained regular communications regarding, among other things, the pending litigation being pursued by the Official Committee of Unsecured Creditors of the Debtors (the

"*Committee*") against certain directors and their affiliates (the "*D&O Litigation*"), as well as Purchaser's commitment to fund $75,000 as liquidating trust costs for certain operating costs pursuant to that certain binding term sheet approved by the Court's Order Granting Motion of the Official Committee of Unsecured Creditors (I) Granting Standing and for Authority for the Creditors Committee to Prosecute Certain Claims, and (II) Approving a Term Sheet Among Debtors, Committee, and Purchaser [D.I. 714] ("*Term Sheet Order*").

25.      Pursuant to the Term Sheet Order, Purchaser will receive D&O Litigation proceeds at different levels in the priority waterfall in exchange for Purchaser's assignment and transfer of any and all claims it purchased via the Purchase Agreement.  Purchaser also holds a deficiency claim for all remaining amounts owed under the Convertible Notes and Pre-Petition Facility (this together with its rights in the D&O Litigation proceeds, the "*Claims*").

26.      To date, Purchaser's funding of the $75,000 for liquidation trust costs pursuant to the Term Sheet has not been triggered, so Purchaser does not currently have any rights to the First Tier Obligations (as defined in the Term Sheet).  Purchaser may, however, have rights to the Fourth, Sixth, and Seventh Tier Obligations.

27.      On November 18, 2021, Debtors received a notice of default from the Attorney General's Office for the State of Texas.  Specifically, the notice of default explained that the Comptroller had not received a tax payment pursuant to the Texas Payment Plan since on or about August 9, 2021 (the "*Texas Default*").

28.      Prior to receiving the Texas Default, Purchaser had not provided to Debtors nor their professionals any previous notice of such breach.

29.      Upon receipt of the Texas Default communication, Debtors' counsel, Bryan Cave Leighton Paisner LLP ("*BCLP*") immediately contacted counsel for Purchaser at Cooley LLP

("*Cooley*"), Cathy Hershcopf and Lauren Reichardt, requesting that Purchaser immediately look into and cure the default.  Additionally, Debtors' counsel requested that Purchaser also confirm that Purchaser is compliant with the Payment Plans for other states.

30.     Cooley confirmed receipt of BCLP's request that same day.

31.     On November 23, 2021, BCLP emailed Cooley again to confirm whether Cooley or Purchaser was in communication with the Office of the Attorney General for the State of Texas to address the Texas Default.  In response, Cooley stated "We have contacted our client, but have no intention of talking directly to TX."

32.     Following this response, BCLP emailed Cooley again for clarification on November 23, 2021, as follows, "Cooley has not [sic] intention and [Purchaser] has no intention? OR Cooley has no intention? Has someone paid the bill? We can't ignore the Texas in light of the default – SOMEONE needs to tell them something. So at minimum, we need to know what is being done to cure."  In response, Cooley indicated, "Lauren promptly contacted the client about the delayed payment. **I will reach out personally to Joel [Weinshanker]** before the holiday, but not until my deposition is over.  **Neither Cooley, nor [Purchaser] will contact Texas**" (emphasis added).

33.     On November 30, 2021, after receiving an inquiry from the State of Texas, BCLP again contacted Cooley on the status of their inquiry and were told, "I reached out to **Joel [Weinshanker] again**" (emphasis added).

34.     After still not receiving an update from Cooley or Purchaser, BCLP again contacted Cooley, on December 2, 2021, for an update, stating:

> Hi Cathy and Lauren – any update?
>
> Chris Murphy from the Texas Comptroller called me this afternoon to see where things stand. He indicated that he is not looking to accelerate and

unwind the settlement, but his discretion is going to slowly slip way unless things are resolved and brought back into compliance.

**I understand that you don't want Cooley and [Purchaser] directly interfacing with Texas, that's okay. I'm happy to do it. But in making me the middle man, I just ask that you help me out here so I'm not in a very awkward and compromising position. Hope you can appreciate that.**

(emphasis added).

35.     By virtue of the foregoing, Cooley and Purchaser had express knowledge that BCLP was relying on the accuracy of information provided by Cooley and Purchaser to update the State of Texas in light of the refusal by Cooley and Purchaser to do so. BCLP, in reliance on the updates from Cooley, assured the State of Texas that Cooley and Purchaser were looking into the Texas Default.

36.     In response, that same day on December 2, 2021, Cathy Hershcopf again responded, stating "I pinged **Joel [Weinshanker]** again and Lauren reached out [Purchaser]" (emphasis added).

37.     During this period, in addition to the repeated requests for Cooley to provide an update on the status of the Texas Default, BCLP also requested confirmation as to whether or not Purchaser was in compliance with other Payment Plan.

38.     On December 10, 2021, BCLP asked Cooley for an update on the status of the Purchaser's review. In this communication, BCLP reemphasized that this information was being conveyed to the State of Texas in order to keep the Attorney General's Office apprised of the situation, stating, "Cathy/Lauren – I was able to preempt Texas from asking for a status update by reporting that you were meeting with [Purchaser]. Do you have an update? I rather not get on the phone with Texas next week until I have something substantive to him. Thanks."

39.     That same day, Lauren Reichardt at Cooley responded, "Long story short is that there has been a lot of turnover at the company over the past months.  Ruby is no longer there and I don't think everything got communicated that should have before she left.  **They are working to become current and I will follow up next week as well**" (the "*December 10th Communication*") (emphasis added).

40.     In reliance on the December 10th Communication, BCLP explained via phone and email to the Attorney General's Office for the State of Texas that the person who had the institutional knowledge and was responsible for making the Payment Plan payments at Purchaser was no longer with Purchaser, which is why payments came to a halt and no one identified the issue. BCLP also advised the Attorney General's Office of Purchaser's stated intent to become current on the payment plan.

41.     Between December 17, 2021 and January 3, 2022, BCLP continued to follow up with Cooley on the status of the Texas Default.  BCLP was told by Cooley that Purchaser was still going through the documents and knew that it owed the Debtors a response on December 17, 2021; that Cooley would follow up again on December 20, 2021; and that Cooley would try to follow up with Purchaser on January 3, 2022.

42.     In further reliance of the December 10th Communication and these subsequent communications from Cooley, BCLP continued to act as the "middle man" and pass along the Cooley reports to the State of Texas.

43.     On January 7, 2022, Chris Davis, a member of the Debtors' board of directors and former consultant to Purchaser, contacted Janna Deal at Purchaser to verify that this information was correct.  Mrs. Deal, who is the director of accounting at Purchaser, told Mr. Davis that the

Purchaser had not made any payments pursuant to the Payment Plans for any state since August 2021.

44.     In light of the foregoing, on January 10, 2022, Mark Palmer (Debtors' Chief Transformation Officer) and Alexandre Zyngier (Debtors' Lead Independent Director) contacted Weinshanker, the primary principal of Purchaser and its affiliates, including parent company, National Entertainment Collectables Association, Inc. ("**NECA**").

45.     During that conversation, Weinshanker acknowledged Purchaser's current breach of the Purchase Agreement and the Sales Tax Funding Commitment and indicated that Purchaser has no current intention of curing these breaches.  Weinshanker stated that he has been taking certain measures to "wind down" Purchaser's business. When specifically pressed, Weinshanker confirmed that he is not ceasing the whole business of Purchaser, but is instead "shifting" parts of the business to other entities controlled by NECA.  Weinshanker also stated that he is intending to use Purchaser revenues and inventory to repay his capital injections into Purchaser, which Weinshanker characterized as secured loans that he and/or NECA advanced to Purchaser.

46.     Based upon information provided by Cooley on January 14, 2022 at 3:30 pm and January 18, 2022 at 3:30 pm (EST), Debtors understand that the Purchaser owed approximately $2.6 million under the Payment Plans, of which approximately $800,000 in payments was delinquent.

47.     On January 19, 2022, Debtors and their Boards of Directors (the "**Board**") sent a letter to Purchaser demanding that Purchaser cure all breaches under each of the Payment Plans and maintain compliance with such obligations while Debtors and Purchaser discuss a path forward in good faith (the "**Notice of Defaults**").  The Notice of Defaults also cautioned that any party taking part in any diversion or distribution of assets from Purchaser to any affiliates of

Weinshanker should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity is having its assets diminished or "wound down" for the benefit of insiders.

48.     In the Notice of Defaults, Debtors reminded Purchaser that pursuant to Section 2.6(a)(iii) of the Purchase Agreement, Purchaser's performance of its Sales Tax Funding Commitment obligations was ***and continues to be*** a material component of the "Purchase Price." Specifically, the Notices of Default stated:

> Moreover, anyone taking part in any diversion or distribution of assets from [Purchaser] to any affiliates of Mr. Weinshanker or NECA should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity that is having its assets diminished or "wound down" for the benefit of insiders, as Mr. Weinshanker indicated is occurring.

49.     Debtors further noted that Section 7 of the Sales Tax Funding Commitment  was not intended to (nor does it) absolve Purchaser from its payment obligations under the Purchase Agreement and Weinshanker or his affiliates or constituents from fraud, fraudulent transfers, or asset stripping while transferring Purchaser's assets and/or business to affiliates to prevent Debtors and other Purchaser creditors from seeking redress.

**Current Company Operations**

50.     The Debtors are informed and believe that approximately $30 million of billings ran through Purchaser in 2021.

51.     The Debtors are informed and believe that, on average, Purchaser had $2 million of billings per month in the second half of 2021.

52.     The Debtors are informed and believe that as of January 2022, Purchaser had approximately 60,000 active subscribers.

Page 13

53.     The Debtors are informed and believe that as of January 26, 2022, Purchaser was still the merchant of record for customer credit card billings with Stripe, PayPal and Amazon.

54.     The Debtors are informed and believe that the total outstanding obligations under the Payment Plans is approximately $2.6 million, with at least $800,000 in default as of December 31, 2021.

55.     The Debtors are informed and believe that Purchaser is terminating the employment of various of its employees and advising them that Purchaser is "dissolving."  However, Purchaser also has acknowledged to at least one terminated employee that the Purchaser's e-commerce and subscription business would continue to operate through Purchaser's sister companies.

## COUNT I
### Breach of Contract against Purchaser– Asset Purchase Agreement

56.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

57.     The Plaintiffs and Purchaser are parties to the Purchase Agreement, which is a valid contract.

58.     Pursuant to the Purchase Agreement, Purchaser agreed to pay the Purchase Price in exchange for substantially all of Plaintiffs' assets.

59.     The Purchase Price included, among other things, the following: (i) $30 million payable in the form of a credit bid; (ii) a cash component described as the Budgeted Reserve; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]."  *See* Purchase Agreement § 2.6(a).

USA.602512244.6/YQM

60.     As a condition to closing and in order to satisfy the third component of the Purchase Price, the Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.  *See* Purchase Agreement §8.5(e).

61.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

62.     The Purchase Agreement is a binding contract that imposed the Sales Tax Funding Commitment obligations on Purchaser.

63.     Purchaser fulfilled the first two obligations of the Purchase Price.

64.     Purchaser failed to perform the third obligation of the Purchase Price and thus has failed to fully perform its obligations under the Purchase Agreement and the Sales Tax Funding Commitment obligations by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

65.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

66.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

67.     As a result of the material breaches of the Purchase Agreement, Plaintiffs have suffered damages in an amount to be proven at trial.  On information and belief, Plaintiffs' damages will exceed $3.5 million, which includes expenses, costs, and past due sales tax payments.

## COUNT II
### Breach of Contract against Purchaser– Sales Tax Funding Commitment

68.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

69.     The Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.

70.     The Sales Tax Funding Commitment is a valid contract that requires Purchaser fund, directly or indirectly, the payments due under the Payment Plans.

71.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

72.     Purchaser failed to fully perform its obligations under the Sales Tax Funding Commitment obligations by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

73.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

74.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

75.     As a result of the material breaches of the Sales Tax Funding Commitment, Plaintiffs have suffered damages in an amount to be proven at trial.  The Debtors are informed and believe that Plaintiffs' damages will exceed $3.5 million, which includes expenses, costs, and past due payments owed under the Payment Plans.

COUNT III

**Breach of Contract against Purchaser– Sales Tax Funding Commitment**

76.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

77.     As a condition to closing and in order to satisfy a component of the Purchase Price, the Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.

78.     The Sales Tax Funding Commitment is a valid contract that requires Purchaser fund, directly or indirectly, the payments due under the Payment Plans.

79.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

80.     Purchaser failed to fully perform its obligations under the Sales Tax Funding Commitment obligations by failing to provide evidence of payments made to each of the state taxing authorities pursuant to the Payment Plans, even after Debtors demanded such written documentation evidencing payments were made.

81.     As a result of the material breaches of the Sales Tax Funding Commitment, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT IV

**Specific Performance against Purchaser**

82.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

83.     Plaintiffs and Purchaser are parties to the Purchase Agreement and the Sales Tax Funding Commitment.

84.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the sales Tax Funding Commitment, which are valid contracts.

USA.602512244.6/YQM

85.     Purchaser failed to perform the third obligation of the Purchase Price and thus has failed to fully perform its obligations under the Purchase Agreement and the Sales Tax Funding Commitment by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

86.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

87.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

88.     The conduct of Purchaser, as described above, constitutes material and uncured breaches of the express terms of the Purchase Agreement and Sales Tax Funding Commitment.

89.     The parties to the  Sales Tax Funding Commitment expressly agreed that Plaintiffs are "entitled to seek specific performance against [Purchaser] to cause [Purchaser] to satisfy its obligations [there]under." Sales Tax Funding Commitment § 4.

90.     Furthermore, it is patently inequitable for Purchaser to retain the benefit of the bargain without performing its obligations under the Sales Tax Funding Commitment.

91.     Purchaser should, therefore, be required to specifically perform its obligations under the Sales Tax Funding Commitment, including its obligations to pay all past-due and future installments owing under each Payment Plan.

92.     Under the terms of the Sales Tax Funding Commitment, Plaintiffs are entitled to an award of costs and expenses incurred in prosecuting this action.

USA.602512244.6/YQM

## COUNT V
### Equitable Subordination Against Purchaser

93.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

94.     Pursuant to Section 510(c) of the Bankruptcy Code, a court may, under principles of equitable subordination, subordinate all or part of an allowed claim to all or part of another allowed claim or interest.

95.     Purchaser knew of the breach of the Sales Tax Funding Commitment obligations as early as May 2021 with respect to the state of Texas.

96.     Purchaser did not disclose this breach to Debtors.

97.     Debtors relied on their belief that Purchaser was continuing to perform under the Sales Tax Funding Commitment and continued to pursue the D&O litigation, of which some of the proceeds will benefit Purchaser, and did not enforce specific performance rights pursuant to the Sales Tax Funding Commitment in such reliance.

98.     Upon notification of the Texas Default on November 18, 2021, Purchaser prolonged the façade that other payments were being made pursuant to the Sales Tax Funding Commitment.

99.     In fact, Purchaser intentionally mislead Debtors by stating, "Long story short is that there has been a lot of turnover at the company over the past months.  Ruby is no longer there and I don't think everything got communicated that should have before she left.  **They are working to become current and I will follow up next week as well**"  This statement was made even though Purchaser had no intention of becoming current on the past-due payments owed to Texas.

100.    Not until December 2021 did Purchaser acknowledge that there may have been a default in payments under the Texas Payment Plan; however, at no point did Purchaser give notice to Debtors of any other breaches.

101.    The actions of Purchaser, as described above, constitute unfair and inequitable conduct.

102.    Such inequitable conduct has harmed creditors of Debtors, including but not limited to the Debtors' general unsecured creditors.  Assuming the Payment Plan breaches are not cured, any proceeds from the D&O Litigation will first be applied to satisfy the outstanding priority tax claims that the Purchaser was supposed to satisfy as part of the Purchase Price, many of which are likely to be priority claims under Section 507(a)(8) of the Bankruptcy Code.  Such additional priority obligation are likely to significantly reduce any distribution to general unsecured creditors.

103.    Also, the ongoing stripping of assets of Purchaser is both highly inequitable and threatens to render a judgment in favor of Plaintiffs for damages an inadequate legal remedy.

104.    Such inequitable conduct has also provided an unfair advantage to Purchaser, which received the Debtors' assets for less than the bargained for Purchase Price and is still set to receive its ratable share of the D&O Litigation proceeds.

105.    The balance of equities clearly weigh in Plaintiffs' favor because the failure to make the payments pursuant to the Payment Plans does not solely result in monetary damages; instead, a breach of the Payment Plans could also lead to personal liability of certain officers and directors of Debtors.

106.    Pursuant to Section 510(c) of the Bankruptcy Code, any claims of any of the Purchaser should be subordinated to the claims of other creditors in Debtors' bankruptcy case.

## COUNT VI
## **Fraud Against Purchaser**

107.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

108.    Purchaser knew of the breach of the Sales Tax Funding Commitment obligations since May 2021.

109.    Purchaser intentionally did not disclose this breach to Debtors.

110.    Upon Debtors' notification of the Texas Default, Purchaser falsely represented to Debtors that "**[Purchaser is] working to become current and I will follow up next week as well**"  This statement was made even though Purchaser had no intention of becoming current on the past-due payments owed to Texas.

111.    Purchaser knew that its statement that it was working to become current on the Texas Payment Plan was false.

112.    Purchaser intended the Debtors to rely on its statement that it was working to become current on the Texas Payment Plan.

113.    Plaintiffs relied upon Purchaser's false statement that it was working to become current on the Texas Payment Plan by relaying the false representation to Texas authorities and continuing not to take any actions to specifically enforce Debtors' rights under the Purchase Agreement and Sales Tax Funding Commitment.  Plaintiffs' reliance upon Purchaser's representation was reasonable and justifiable.

114.    Plaintiffs have incurred damages as a result of their reliance on Purchaser's false representation.

115.    Purchaser's actions were undertaken with malice, moral turpitude, and wantonness.

116.    Accordingly, Plaintiffs are entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

## COUNT VII
**Unjust Enrichment Against Purchaser**

117.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

118.    Plaintiffs conferred a benefit upon Purchaser by transferring substantially all of their assets to Purchaser in exchange for Purchaser's agreement to pay the Purchase Price. Additional benefits were conferred on Purchaser when Debtors agreed to defer payment of the sales-tax portion of the Purchase Price by allowing Purchaser to satisfy it over time and when Debtors have pursued the D&O Litigation, of which some of the proceeds will benefit Purchaser.

119.    Purchaser's breach of the Sales Tax Funding Commitment and its attempt to abandon its Purchase Price obligation while retaining the full benefit of Debtors' assets and business opportunities and transferring assets and operations to its affiliates, violate fundamental principles of justice, equity, and good conscience, and Purchaser equitably ought to compensate Plaintiffs for the benefits conferred upon it.

120.    Unless Purchaser is required to compensate Plaintiffs for the benefits conferred upon it, Purchaser will be unjustly enriched at the expense of Plaintiffs.

121.    Plaintiffs are entitled to an order of this Court requiring Purchaser to compensate Plaintiffs for the benefits conferred upon it, in an amount to be determined at trial.

## COUNT VIII
**Avoidance of Transfers to John Doe**

122.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

USA.602512244.6/YQM

123.    Purchaser's transfer of assets to one or more of its affiliates (the "***Transfers***") is fraudulent under Section 1304 of Title 6 of the Delaware Code (the "***Delaware Code***")

124.    Purchaser made the Transfers with actual intent to hinder, delay, and/or defraud the Debtors, in particular in their ability to enforce its specific performance rights or to recover damages under the Sales Tax Funding Commitment.

125.    Alternatively, Purchaser made the Transfers without receiving reasonably equivalent value in exchange for the Transfers, and at the time of the Transfers Purchaser was insolvent, was rendered insolvent, or was engaged in a business for which its remaining assets were unreasonably small.

126.    Alternatively, Purchaser made the Transfers to an insider for an antecedent debt, Purchaser was insolvent at the time, and the insider had reasonable cause to believe that Purchaser was insolvent at the time.

127.    At all relevant times, Plaintiffs were creditors of Purchaser holding claims within the meaning of Section 1301 of the Delaware Code.

128.    Accordingly, the Transfers should be avoided as fraudulent in accordance with Section 1307 of the Delaware Code.

COUNT IX
**Recovery of Avoided Transfers from John Doe**

129.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

130.    Plaintiffs are entitled to recover, for the benefit of their estates, the property included in the Transfers from the initial transferee of the Transfers or the entity for whose benefit the Transfers were made.

USA.602512244.6/YQM

## **RELIEF REQUESTED**

WHEREFORE Plaintiffs demand judgment in their favor and request the following relief:

(a)     Entry of a decree of specific performance of Purchaser's obligations under the Sales Tax Funding Commitment, including reimbursement of Plaintiffs' costs and expenses incurred in bringing this action, and requiring pre-funding of an escrow for use in paying the remaining payments for the Payment Plans;

(b)     In the alternative, entry of a judgment for money damages in an amount to be proven at trial;

(c)     Entry of a decree equitably subordinating Purchaser's Claims and extinguishing its right to any proceeds of the D&O Litigation;

(d)     Entry of a judgment avoiding the Transfers and directing recovery of the associated assets for the benefit of the Debtors and their estates; and

(e)     such other and further relief as is just.

*[This space left intentionally blank.]*

USA.602512244.6/YQM

Dated: February 2, 2022
Wilmington, Delaware

ROBINSON & COLE LLP

/s/ Jamie L. Edmonson
Natalie D. Ramsey (No. 5378)
Jamie L. Edmonson (No. 4247)
1201 North Market Street
Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile:   (302) 516-1699
Email:  nramsey@rc.com
           jedmonson@rc.com

*Co-Counsel to Plaintiffs*

BRYAN CAVE LEIGHTON PAISNER LLP
Mark I. Duedall (No. 3346)
Leah Fiorenza McNeill (*Admitted pro hac vice*)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
          leah.fiorenza@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
Andrew J. Schoulder (*Admitted pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile:  (212) 541-4630
Email: andrew.schoulder@bclplaw.com

*Co-Counsel to Plaintiffs*