## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Old LC, Inc. (f/k/a Loot Crate, Inc.), *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 22-<u>50107</u> (BLS) |
| | § | |
| The Loot Company (f/k/a Loot Crate | § | |
| Acquisition LLC) and John Doe, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF MARK PALMER IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTIVE RELIEF PURSUANT TO FEDERAL
<u>RULE OF BANKRUPTCY PROCEDURE 7065 AND 11 U.S.C. §105</u>**

I, Mark Palmer, hereby declare pursuant to 28 U.S.C. § 1746, that the following statements are true and correct, to the best of my knowledge and belief after due inquiry described herein.

1.      On August 11, 2019, I, on behalf of Theseus Strategy Group, LLC was appointed as Chief Transformation Officer of Old LC, Inc., Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. (collectively, the "***Debtors***"), and I have served in that capacity since then.

2.      I am a Managing Director of Theseus Strategy Group, LLC.

---

[1]      Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

3.       In my role as Chief Transformation Officer of the Debtors, I was tasked with, among other things, negotiating and structuring the purchaser agreement providing for the sale of substantially all of the Debtors' assets pursuant to that certain Asset Purchase Agreement, dated as of September 27, 2019 (as amended, the "***Purchase Agreement***"), and effective as of October 1, 2019 (the "***Sale***").  Additionally, I was also responsible for, among other things, restarting the Debtors' supply and logistical operations while at the same time assisting in transitioning the Debtors' operations to the buyer of the Debtors' assets, The Loot Company f/k/a Loot Crate Acquisition LLC ("***Purchaser***").

4.       This declaration is being filed in support of the *Plaintiffs' Motion for Preliminary Injunctive Relief Pursuant to Federal Rule of Bankruptcy Procedure 7065 and 11 U.S.C. § 105* (the "***Motion***"). [2]   I am over the age of eighteen, and have personal knowledge of the facts in this matter, and if called upon to testify, could and would do so.

5.       Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of the Sales Tax Funding Commitment dated October 1, 2019, by which the Purchaser committed to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment obligations of Debtors arising in the states listed on <u>Appendix A</u> attached thereto as such individual payments become due under the Payment Plans attached as <u>Appendix B</u> attached thereto (as updated from time to time after October 1, 2019, in accordance with the Purchase Agreement and the Sales Tax Funding Commitment).  The Purchaser's commitment to fund the payments under the Payment Plans was a material component of the Purchase Price under the Purchase Agreement and material inducement to the Debtors' entry into the transactions.

---

[2]       Any capitalized terms used but not described herein shall have the meanings ascribed to such terms in the Motion.

6. Between the closing of the Sale and approximately November 1, 2021, Debtors and Purchaser maintained regular communications regarding, among other things, the pending litigation being pursued by the Official Committee of Unsecured Creditors of the Debtors (the "***Committee***") against certain directors and their affiliates (the "***D&O Litigation***"),[3] as well as Purchaser's commitment to fund $75,000 as litigation trust funding for certain operating costs pursuant to that certain binding term sheet approved by the Court's *Order Granting Motion of the Official Committee of Unsecured Creditors (I) Granting Standing and for Authority for the creditors Committee to Prosecute Certain Claims, and (II) Approving a Term Sheet Among Debtors, Committee, and Purchaser* [D.I. 714] ("***Term Sheet Order***").

7. To date, Purchaser's funding of the $75,000 for liquidation trust costs pursuant to the Term Sheet has not been triggered, and so the Debtors have not received such funding.

8. Prior to receiving the Texas Default (as defined in the Declaration of Andrew Schoulder), Purchaser had not provided to Debtors any previous notice of the breach of its obligations under the Purchase Agreement and Sales Tax Funding Commitment – with respect to the State of Texas or any other state.

9. Following the receipt of the Texas Default and subsequent learning that Purchaser has been in default of its obligations under substantially all of the Payment Plans since August 2021, on January 10, 2022, the Debtors' lead independent director, Alexandre Zyngier, and I spoke by telephone with Mr. Joel Weinshanker ("***Weinshanker***") the primary principal of Purchaser and its affiliates, including parent company, National Entertainment Collectables Association, Inc. ("***NECA***").

---

[3]    *The Official Committee of Unsecured Creditors of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., et al. v. Upfront V, LP, Breakwater Credit Opportunities Fund, L.P.; Upfront GP V, LLC; Mark Suster, Dana Kibler, Gregory Bettinelli; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski*, Adv. Proc. No. 20-51002 (BLS).

10.     During that conversation, Weinshanker acknowledged Purchaser's current breach of the Purchase Agreement and the Sales Tax Funding Commitment and indicated that Purchaser has no current intention of curing these breaches.  Weinshanker stated that he has been taking certain measures to "wind down" Purchaser's business. When specifically pressed, Weinshanker confirmed that he is not ceasing the whole business of Purchaser, but is instead intending on "shifting" parts of the business and/or assets to other entities controlled by NECA. Weinshanker admitted to his intention to abandon the Payment Plan obligations of Purchaser.  Weinshanker also stated that he is intending to use Purchaser revenues and inventory to repay his capital injections into Purchaser, which Weinshanker characterized as secured loans that he and/or NECA advanced to Purchaser.    When Mr. Zyngier and I identified these actions as a breach of the Purchase Agreement and Sales Tax Funding Commitment, Weinshanker stated that Cooley LLP advised that the agreements permitted him to "wind down" the Purchaser while abandoning the liabilities and payment obligations under the Payment Plans.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: February 1, 2022
Asheville, North Carolina

Mark Palmer
Debtors' Chief Transformation Officer

USA.604766554.4/MO8

## EXHIBIT A

**Sales Tax Funding Commitment**

**STRICTLY CONFIDENTIAL**

Loot Crate Acquisition LLC
603 Sweetland Avenue
Hillside, NJ 07205

October 1, 2019

Loot Crate, Inc.
Loot Crate Holdings, Inc.
LC Funding, Inc.
Loot Crate Parent, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031-1929
Attention: Stuart Kaufman

   Re: Sales Tax Funding Commitment

Ladies and Gentlemen:

   Reference is hereby made to that certain Amended and Restated Asset Purchase Agreement, dated as of September 27, 2019 (the "**Purchase Agreement**") by and among Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc. and Loot Crate Parent, Inc. (collectively, the "**Sellers**"), and Loot Crate Acquisition LLC ("**Purchaser**"). This letter agreement (this "**Agreement**") sets forth the commitment of Purchaser, subject to the terms and conditions hereof, to make certain payments on behalf of the Sellers to the applicable Taxing Authorities under the Payment Plans in accordance with Section 8.5 of the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

   1. Upon the terms and subject to the conditions set forth herein, concurrently with the Closing, Purchaser hereby commits to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment obligations of the Sellers and any Successor Entity (each, a "**Seller Entity**" and collectively, the "**Seller Entities**") arising in the states listed on <u>Appendix A</u> attached hereto (the "**States**") as such individual payments become due under the Payment Plans attached hereto as <u>Appendix B</u> (as updated from time to time after the date hereof in accordance with the Purchase Agreement and this Agreement) entered into by the applicable Seller Entities with the Taxing Authorities of the States (collectively, as updated from time to time in accordance with the Purchase Agreement and this Agreement, the "**Sales Tax Funding Commitment**"); <u>provided</u>, <u>however</u>, that Purchaser shall have no obligation to fund, directly or indirectly, any amounts upon the termination of this Agreement other than Defaulted Payments. Upon the finalization of each Post-Closing Payment Plan after the Closing in accordance with Section 8.5 of the Purchase Agreement, <u>Appendix B</u> hereto will be updated to include such Post-Closing Payment Plan, and this Agreement will then cover such payment obligations.

   2. Purchaser shall make Sales Tax Funding Commitment payments under a Payment Plan either, in Purchaser's discretion (unless an applicable State directs otherwise), directly to the applicable State Taxing Authority or to the applicable Seller Entity for its payment to the

applicable State Taxing Authority in accordance with the Payment Plan; provided that with respect to any payments made by Purchaser directly to a State Taxing Authority, Purchaser shall provide to the Seller Entities written documentation evidencing such payment was made.

      3.    This Agreement shall terminate, automatically and without any need for any action by any Person, upon the earliest to occur of the following:

      (a)    Purchaser's establishment of a Material Breach as follows:

      i.    On or before (x) February 29, 2020 (i.e., 60 days after December 31, 2019) in the event that the Closing under the Purchase Agreement occurs on or before October 1, 2019 or (y) the date that is on the six-month anniversary of the Closing in the event that the Closing occurs after October 1, 2019 (the date of the applicable notice deadline, the "**Notice Date**"), Purchaser shall have (A) delivered written notice with reasonable detail (it being agreed, however, that any claim by Sellers regarding any alleged lack of reasonable detail shall not be grounds for disqualifying any notice provided on or before the Notice Date) to the Seller Entities describing (I) the material inaccuracies in the financial information listed on Schedule I attached hereto and made available to Purchaser prior to the Closing in the Merrill Data Site folder titled "2 Financial" (the "**Financial Data**") or (II) the material breaches of, the Sellers' representations and warranties set forth in Section 3.3 of the Purchase Agreement, that have caused a "Material Adverse Effect" (as defined below) ((I) or (II), a "**Material Breach**"), and (B) deposited, by wire transfer of immediately available funds, an amount equal to $150,000 in a reserve account designated by the Seller Entities to fund certain costs and expenses as set forth herein (the "**Fee Reserve**").

      ii.    Purchaser shall establish a Material Breach has occurred by obtaining, at its election, either (A) an entry of a final judgment by the Bankruptcy Court, which shall have exclusive jurisdiction with respect thereto (the "**Material Breach Order**"), or (B) a final determination by Sheila Enriquez of Briggs & Veselka Co. (the "**Independent Auditor**") upon review of the Financial Data and related materials reasonably requested by the Independent Auditor to make such determination. In the event Purchaser elects to seek a Material Breach Order, each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. The Parties acknowledge and agree that in the event Purchaser elects to seek a determination by an Independent Auditor, any determination by the Independent Auditor shall be final, binding and non-appealable and non-reviewable.

      iii.    The Seller Entities shall use the funds in the Fee Reserve to pay all costs and expenses arising from either the Seller Entities' Representatives (in the event Purchaser elects to obtain a Material Breach Order) or the Independent Auditor, including, without limitation, promptly funding a retainer for the Independent Auditor

(the "**Establishment Costs**").  In the event Purchaser is unable to establish a Material Breach, Purchaser shall (A) reimburse the Seller Entities for all additional Establishment Costs in excess of $150,000 and (B) be responsible for any additional interest or penalties payable under the Payment Plans, in excess of the Fee Reserve.  The unused portion of the Fee Reserve, if any, shall be promptly paid to Purchaser.

       iv.     For the avoidance of doubt, (A) the obligations of Purchaser to fund the Sales Tax Funding Commitment shall continue unless and until Purchaser has established a Material Breach in accordance with the terms hereof; (B) any failure by Purchaser to fund amounts due to the Taxing Authorities under the Sales Tax Funding Commitment prior to Purchaser's establishment of a Material Breach shall constitute a material default by Purchaser under this Agreement ("**Defaulted Payments**"); and (iii) if a Material Breach is established by Purchaser, Purchaser shall remain liable for and satisfy any portion of the Sales Tax Funding Commitment that came due and remains unpaid prior to the establishment of the Material Breach as a condition to the effectiveness of this Section 3(a).

       v.     For purposes of this Agreement, a "**Material Adverse Effect**" means any material adverse effect on the Purchased Assets or the Business; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect:  (A) changes in general business or economic conditions affecting the industry in which the Sellers operate the Business, (B) changes in national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (C) changes in, GAAP after the date hereof, (D) changes in applicable Laws after the date hereof, (E) changes resulting from the public announcement of this Agreement or the Transactions, (F) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance of doubt, the underlying causes of any such failure), (G) changes to the extent resulting from the actions or omissions of Purchaser after the Closing Date with respect to the Purchased Assets or the Business, (H) any event, change, occurrence, circumstance, development or effect resulting from any action with respect to which the Sellers obtained the consent of the DIP Lender to take, and (I) any increase in subscriber churn, reduction in new sign ups or loss or non-assignment of vendor/licensor relationships to the extent caused by (1) a reduction in marketing spend from and after the filing of the Bankruptcy Cases, (2) the announcement or filing of the Bankruptcy Cases, (3) any action taken by Sellers with the prior written consent of Purchaser or with due care and in accordance with the directions of Purchaser pursuant to the Purchase Agreement or Transition Services Agreement or (4) any action not taken by the Sellers (x) at Purchaser's written request or (y) as a result of Purchaser's refusal to grant consent to such action after Sellers' written request pursuant to the Purchase Agreement or Transition Services Agreement.

(b)    the date that any Seller Entity or any of their Representatives (i) asserts in any Action, litigation or other proceeding (x) that one or more of the provisions in Section 7 of this Agreement are illegal, invalid or unenforceable in whole or in part, (y) that Purchaser has any liability under this Agreement other than to fund cash payments (including penalties and interest with respect to any Defaulted Payments) with respect to the Sales Tax Funding Commitment in accordance with the Payment Plans or (z) any claim or theory of liability against the Non-Recourse Parties (as defined below) relating to this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement or (ii) asserts, or threatens to assert, any claim against a Non-Recourse Party (as defined below) in connection with this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement (including in respect of any oral representations made or alleged to be made in connection therewith), whether in any Action, litigation or other proceeding, through counsel or in any other way; and

(c)    the date that Purchaser has fulfilled its payments obligations under Section 1 of this Agreement (including penalties and interest with respect to any Defaulted Payments).

4.    The Seller Entities shall be entitled to seek specific performance against Purchaser to cause Purchaser to satisfy its obligations hereunder, with the costs and expenses of the Seller Entities in seeking such relief being an obligation of the Purchaser.

5.    Each party hereto acknowledges and agrees that this Agreement is not intended to, and does not, create any agency, partnership, fiduciary or joint venture relationship between or among any of the Parties hereto and neither this Agreement nor any other document or agreement entered into by any Party hereto relating to the subject matter hereof shall be construed to suggest otherwise.

6.    Purchaser acknowledges and agrees that this Agreement may be assigned by the Sellers to the Successor Entity in connection with the Successor Entity's assumption from the Sellers of all Liabilities arising from Pre-Petition Sales Taxes and the Payment Plans.  Upon such assignment, this Agreement shall inure to the benefit of the Successor Entity and shall be enforceable by the Successor Entity as if it was the Sellers under this Agreement.

7.    Notwithstanding anything that may be expressed or implied in this Agreement or any document or instrument delivered in connection herewith or otherwise, each of the Sellers, by its acceptance of the benefits hereof, covenants, agrees and acknowledges for itself and its Affiliates, and any Person claiming on its or their behalf, from time to time (including, without limitation, the Seller Entities), that no person other than Purchaser has any liabilities, obligations or commitments of any nature (whether known or unknown, whether due or to become due, absolute, contingent or otherwise) hereunder (in each case subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that, notwithstanding that Purchaser is a limited liability company, no Person other than Purchaser shall have any obligation hereunder or under any document or instrument delivered in connection herewith, against, or any claim (whether in bankruptcy, tort, contract or otherwise) based on, in respect of, or by reason of, this Agreement or arising out of or in connection with the transactions

4

contemplated hereby, and that no recourse hereunder or under any documents or instruments delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, and no personal liability with respect thereto shall attach to, be imposed upon or otherwise be incurred by (a) any former, current or future equity holder, controlling person, director, officer, employee, agent, Affiliate, member, manager, general or limited partner, Representative or successor or assignee of Purchaser or (b) any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, Representative or successor or assignee of the foregoing (such Persons, collectively, but excluding Purchaser, the "**Non-Recourse Parties**"), whether by or through attempted piercing of the corporate veil, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law. Notwithstanding anything to the contrary in this Agreement, this Section 7 shall survive the termination and expiration of this Agreement.

8.      None of the Sellers may assign or delegate its rights, interests or obligations under this Agreement (by operation of law or otherwise) to any other Person (other than a Successor Entity or Bankruptcy Successor in accordance with Section 6) without the prior written consent of Purchaser.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including with respect to the Sellers, any chapter 7 trustee, plan administrator, trustee of a liquidating trust, or other successor arising from the pendency of the Bankruptcy Cases.  Any purported assignment of this Agreement in contravention of this Sections 6 and 8 shall be null and void.

9.      The directors and officers listed on Schedule II hereto will be express third party beneficiaries of this Agreement if and to the extent (and solely to the extent) that such person seeks specific performance of Purchaser's obligation to fund a payment in respect of the Sales Tax Funding Commitment, in each case, if and only to the extent permitted by, and subject to the limitations set forth in, the next sentence and for no other purpose (including, without limitation, any claim for monetary damages hereunder).  In the event that (i) Purchaser fails to timely fund a payment required to be made under the Sales Tax Funding Commitment and (ii) Purchaser fails to cure such failure within ten (10) Business Days of written notice from an officer or directed listed on Schedule II, then the directors and officers listed on Schedule II shall be entitled to seek specific performance of Purchaser's obligation to fund such payment under Section 1 of this Agreement.  Except for the directors and officers listed on Schedule II (pursuant to the first two sentence of Section 9 of this Agreement) and the Non-Recourse Parties (pursuant to Section 7 of this Agreement) and any rights assigned to a permitted assignee (pursuant to Sections 6 and 8 of this Agreement), no Person shall be entitled to rely upon this Agreement, and this Agreement shall be binding upon and inure solely to the benefit of each Party hereto and nothing herein or in any other agreement (including, without limitation, the Purchase Agreement), express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies whatsoever under or by reason of this Agreement.

10.      Sections 12.1 (Notice), 12.2 (Waivers), 12.4 (Governing Law) and 12.5 (Jurisdiction) shall apply to this Agreement and are incorporated herein by reference.

11.    This Agreement constitutes the entire agreement, and supersedes any and all prior or contemporaneous agreements (other than the Purchase Agreement), whether written or oral, with regard to the subject matter herein.  Notwithstanding the foregoing, this Agreement is subject in all respects to the terms and conditions of the Purchase Agreement and nothing herein, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms, representations and warranties or covenants contained in the Purchase Agreement.  No amendment, modification or waiver of any of the provisions of this Agreement will be valid unless set forth in a written instrument signed by the party to be bound.  An executed copy of this Agreement may be delivered by means of a facsimile machine or other electronic transmission (including .pdf., tif, .gif, .jpeg or similar attachment to electronic mail files), and shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*      *      *      *      *

If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____
Name: Joel Weinshanker
Its:   Sole Member


SELLERS:

Loot Crate, Inc.

By: _____
Name:
Its:

Loot Crate Holdings, Inc.

By: _____
Name:
Its:

LC Funding, Inc.

By: _____
Name:
Its:


Loot Crate Parent, Inc.

By: _____
Name:
Its:

       If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____
Name: Joel Weinshanker
Its:   Sole Member

SELLERS:

Loot Crate, Inc.

By: _____
Name:  Mark Palmer
Its:      Chief Transformation Officer

Loot Crate Holdings, Inc.

By: _____
Name:  Mark Palmer
Its:      Chief Transformation Officer

LC Funding, Inc.

By: _____
Name:  Mark Palmer
Its:      Chief Transformation Officer

Loot Crate Parent, Inc.

By: _____
Name:  Mark Palmer
Its:      Chief Transformation Officer

Appendix A

**State / Jurisdiction**

Alabama
Arizona
California
Colorado
Connecticut
Florida
Georgia
Hawaii
Illinois
Indiana
Iowa
Kentucky
Louisiana
Maine
Maryland
Michigan
Mississippi
Nebraska
New Jersey
New York
North Carolina
North Dakota
Pennsylvania
South Carolina
Texas
Utah
Vermont
Washington
Wisconsin

Australia GST

<u>Appendix B</u>

Payment Plans
(as of October 1, 2019)

[See attached]

**REDACTED**
**FILED UNDER SEAL**

**<u>SCHEDULE I</u>\***

2.1.1 – Loot Crate – AP Summary_3.31.19

2.1.2 – Loot Crate – Vendor summary_3.31.19

2.1.3 – Loot Crate – Vendor summary_3.31.19 (By Country & Type)

2.2.1 – Loot Crate – AR summary_3.31.19

2.3.1 – Legendary – Deferred Revenue Recognition Waterfall

2.4.1 – Loot Crate – Inventory Aging_3.31.19

2.5.1 – Loot Crate – Operating Model_3.31.19

2.6.1 – Loot Crate – Crate Costs_Jan 2019

2.6.2 – Loot Crate – COGS Breakout_2018

2.7.1 – Loot Crate – Critical Vendor Summary

2.7.2 – Loot Crate – 13 Week Cash Flow

2.7.3 - Loot Crate – Unfunded Deferred Revenue

2.7.4 – Break-Even Analysis – 6.5.19

2.7.7 – Washington Sales Tax Payment Plan – August 19

2.7.8 – California Sales Tax Payment Plan

2.7.9 – California Sales Tax Payment Plan – Confirmation Letter

2.7.10 – California Sales Tax Payment Plan and Related Info

2.7.12 – Financial Statement 06-2019

2.7.13 – Loot Crate 503(b)(9) Claim List

2.7.17 – Schedule Attachment 3.3(a)(i) – Financial Statements - 2018

Schedule 8.5(a)(i) of the Asset Purchase Agreement (Sales Taxes Schedule)

\*It is understood and agreed that: (a) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance of doubt, the underlying

causes of any such failure) included in the Financial Data are excluded from determining whether there are (I) material inaccuracies in the Financial Data or (II) material breaches of, the Sellers' representations and warranties set forth in Section 3.3 of the Purchase Agreement, that have caused a "Material Adverse Effect" (as defined in the Sales Tax Funding Commitment to which this Schedule I is attached); (b) the accuracy of the Financial Data is as of the date such Financial Data was prepared; and (c) 2.7.1 – Loot Crate – Critical Vendor Summary was prepared in April 2019 for purposes of marketing a traditional out-of-court sale of the Business and not for use in the context of a chapter 11 case, and any "critical vendor" references therein do not refer to "critical vendors" as such term is used in the context of a chapter 11 case.

## **SCHEDULE II**

### **Directors and Officers as Third Party Beneficiaries**

Christopher Davis
Alexandre Zyngier
Osman Khan
Mark Palmer
Stuart Kaufman