## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLD LC, INC., *et al.*,[1] | Case No. 19-11791 (BLS) |
| Debtors. | (Jointly Administered) |
| OLD LC, INC., (F/K/A LOOT CRATE, INC.), *et al.*, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 22-50107 (BLS) |
| THE LOOT COMPANY (F/K/A LOOT CRATE ACQUISITION LLC) AND JOHN DOE, | **Re: Adv. D.I. 1  and 28** |
| Defendants. | |

## OPENING BRIEF IN SUPPORT OF THE LOOT COMPANY'S
## <u>MOTION TO DISMISS</u>

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 Cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 West Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

Dated:  March 7, 2022
        Wilmington, Delaware

Erin R. Fay (No. 5268)
Steven D. Adler (No. 6257)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Phone: (302) 655-5000
Email: efay@bayardlaw.com
       sadler@bayardlaw.com

Cathy Hershcopf (*Admitted pro hac vice*)
Lauren A. Reichardt (*Admitted pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Email: chershcopf@cooley.com
       lreichardt@cooley.com

*Attorneys for the Loot Company*
*(f/k/a Loot Crate Acquisition LLC)*

## TABLE OF CONTENTS

I.  SUMMARY OF THE ARGUMENT ...............................................................1

II.  RELEVANT BACKGROUND ................................................................. 3

    A.  The Debtors' Insolvency and the Chapter 11 Filings ...............................3

    B.  The Sale Process in the Chapter 11 Cases ..............................................4

    C.  The Sales Tax Funding Commitment......................................................5

    D.  Alleged Breach of the APA and Sales Tax Agreement ...........................7

ARGUMENT ......................................................................................................10

    I.  Debtors Do Not Allege Breach of Any Requirement of the APA........................11

    II.  Debtors Have No Breach of Contract Claims for Obligations
        Accruing After the Sales Tax Agreement Automatically Terminated .................13

        A.  Debtors Asserted Claims Against Purchaser's Principal and
            Related Entity for Obligations Under the Sales Tax
            Agreement....................................................................................14

        B.  Debtors Asserted Claims Against Purchaser Beyond Its
            Payment Obligations Under the Sales Tax Agreement............................15

        C.  Debtors Have No Valid Causes of Action for Sales Tax
            Accruing After Termination of the Sale Tax Agreement .........................16

    III.  Debtors Cannot Seek Specific Performance of a Contract for
          Payment of Money...................................................................................17

    IV.  Debtors Fail to Allege Grounds for Equitable Subordination ..............................18

    V.  Debtors Have Not Alleged a Valid Claim of Fraud Based on a Few
        Words in Purchaser's Counsel's December 10 Email That Caused
        No Injury .................................................................................................21

        A.  Debtors Have Not Alleged How They Were Injured ..................................22

        B.  Debtors Do Not Allege Purchaser's Counsel Had a Duty to
            Speak or Made a False Statement ................................................23

        C.  Debtors Do Not Plausibly Allege an Intent to Fraudulently
            Induce Them ...............................................................................24

   D.  Debtors' Allegations Do Not Constitute Justifiable Reliance ...................... 26

  VII.  Debtors Cannot Assert a Claim of Unjust Enrichment .......................................... 27

CONCLUSION ............................................................................................................................ 28

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Addy v. Piedmonte*,
    2009 WL 707641 (Del. Ch. Mar. 18, 2009)......................................................................18

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*,
    988 F.2d 1157 (Fed. Cir. 1993)......................................................................10

*All. Compressors LLC v. Lennox Indus. Inc.*,
    2020 WL 57897 (Del. Ch. Jan. 6, 2020).....................................................17, 28

*Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*,
    829 A.2d 143 (Del. Ch. 2003) ......................................................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................11

*Bakerman v. Sidney Frank Importing Co.*,
    2006 WL 3927242 (Del. Ch. Oct. 10, 2006) ...........................................27, 28

*Barcroft Co. v. Bd. of Pub. Works of Town of Lewes*,
    1980 WL 81867 (Del. Ch. Mar. 11, 1980) ......................................................................17

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007)...................................................................... 11

*Candlewood Timber Grp., LLC v. Pan Am. Energy, LLC*,
    859 A.2d 989 (Del. 2004) ......................................................................18

*D.M ex rel. Ray v. Phila. Housing Auth.*,
    613 F. App'x 187 (3d Cir. 2015) ......................................................................11

*DCV Holdings, Inc. v. ConAgra Holding Inc.*,
    889 A.2d 954 (Del. 2005) ......................................................................22

*El-Hewie v. Bergen Cty.*,
    348 F. App'x 790 (3d Cir. 2009) ......................................................................11

*Epic/Freedom, LLC v. Aveanna Healthcare, LLC*,
    2021 WL 1049469 (Del. Ch. Mar. 19, 2021)...........................................17, 18

*Fortis Advisors LLC v. Johnson & Johnson*,
    2021 WL 5893997 (Del. Ch. Dec. 13, 2021)......................................................................26

*ID Biomedical Corp. v. TM Techs.*,
    1995 WL 130743 (Del. Ch. Mar. 16, 1995)....................................................... 27

*ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*,
    2015 WL 3970908 (Del. Super. Ct. June 24, 2015) ..........................................23

*In re Abound Solar Mfg., LLC*,
    547 B.R. 611 (Bankr. D. Del. 2016) ..................................................................28

*In re Aspect Software Parent, Inc.*,
    578 B.R. 718 (Bankr. D. Del. 2017) ..........................................................10, 11

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)............................................................................22

*In re Diazo Serv. Co., Inc.*,
    144 B.R. 771 (Bankr. M.D. Tenn. 1992) ..........................................................21

*In re Insilco Tech., Inc.*,
    480 F.3d 212 (3d Cir.2007)...............................................................................20

*In re Jevic Holding Corp.*,
    2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ........................................ 20

*In re Tropicana Ent., LLC*,
    520 B.R. 455 (Bankr. D. Del. 2014) .................................................................20

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993).................................................................................10

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010).............................................................................11

*Mooney v. Pioneer Nat. Res. Co.*,
    2017 WL 4857133 (Del. Super. Ct. Oct. 24, 2017)......................................25, 27

*Mosiman v. Madison Companies, LLC*,
    2019 WL 203126 (D. Del. 2019) .....................................................................11

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ..............................................................................28

*N. Penn Towns, LP v. Concert Golf Partners, LLC*,
    2021 WL 3562849 (E.D. Pa. Aug. 12, 2021) ..................................................24

*Pedrick v. Roten*,
    70 F. Supp. 3d 638 (D. Del. 2014) ..................................................................27

*Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*,
    554 F.3d 382 (3d Cir.2009) .................................................................19, 20

*Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*,
    2020 WL 881544 (Del. Ch. Feb. 24, 2020) .........................................26

*Sun Life Assurance Co. of Canada – U.S. Operations Hldgs., Inc.*
    *v. Gp, One Thousand One, LLC*,
    206 A.3d 261 (Del. Super. Ct. 2019) ..............................................18

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
    840 A.2d 606 (Del. 2003) .............................................................11

*Wollard v. Yoder & Sons Constr., LLC*,
    2021 WL 141984 (Del. Ch. Jan. 15, 2021) .....................................18

## RULES AND STATUTES

11 U.S.C. § 502 ...............................................................................20

11 U.S.C. § 502(a) ..........................................................................20

11 U.S.C. § 510(c) ..........................................................................19

## PUBLICATIONS

71 AM.JUR.2d, Specific Performance § 10 ...............................................17

Debtors' Complaint arises from The Loot Company's ("**Purchaser**") nonpayment of the Debtors' prepetition sales taxes governed by the Sales Tax Funding Commitment (the "**Sales Tax Agreement**") between Debtors and Purchaser, which the parties entered into and this Court approved as a condition of the closing of the Asset Purchase Agreement (the "**APA**" as defined below). At most, Debtors have a claim for breach of contract. Debtors, however, manufacture numerous other invalid claims against Purchaser, its principal, and a related entity. The Court should dismiss these invalid claims. Furthermore, by threatening and asserting claims beyond a breach of contract claim against Purchaser, Debtors caused the Sales Tax Agreement to terminate automatically on January 19, 2022, and thus Purchaser had no obligations to pay amounts accruing after that date.

Although Purchaser is aware that the sales tax payments are an emotional issue for the Debtors' directors and professionals, the issue before the Court is a straightforward breach of contract and nothing else. By this brief, Purchaser seeks to focus the Court and parties appropriately on the real cause of action here so as to narrow the issues to be joined for an efficient proceeding between two liquidating entities.

## I.    SUMMARY OF THE ARGUMENT

Count I alleges breach of the APA. However, Debtors have not identified any specific provision of the APA that Purchaser failed to perform. The APA requires Purchaser to enter in the Sales Tax Agreement, but is silent regarding post-closing performance under the Sales Tax Agreement.

Counts II and III allege breach of the Sales Tax Agreement. By its own terms, however the Sales Tax Agreement terminated automatically as of January 19, 2022 and/or February 2, 2022.

Debtors, therefore, have no breach claims for amounts payable under the Sales Tax Agreement after those dates.

Count IV seeks specific performance of the Sales Tax Agreement.  However, Debtors cannot obtain the remedy of specific performance where, as here, they have an adequate remedy at law.  Moreover, specific performance is a remedy and not a standalone cause of action.

Count V requests equitable subordination of Purchaser's claims.  This cause of action is invalid because (1) the Complaint fails to plausibly plead that Purchaser holds a claim against Debtors, much less an "allowed claim," (2) Debtors do not allege any "egregious" conduct sufficient to require an equitable remedy, and (3) the allegedly inequitable conduct did not cause any injury to Debtors.

Count VI claims, incredibly, that Purchaser committed fraud.  The sole basis of this fraud is a single, short email from Purchaser's counsel to Debtors' counsel on December 10, 2021.  Debtors allege the email caused Debtors' counsel to (1) refrain from taking formal action for a month regarding the tax payments Debtors knew were unpaid, and (2) relay its version of the email to Texas taxing authorities.  Debtors do not plausibly allege (1) any duty to speak or falsity in counsel's email, (2) any reason counsel would have intended to defraud them, (3) any justification for relying on this single and short email, or (and perhaps most obviously) (4) any injury to Debtors as a result .

Finally, Count VII asserts a quasi-contract claim of unjust enrichment.  But no such claim can exist here because (1) Debtors allege the enforceability of a written contract, and (2) Debtors can be made whole by money damages.

For these reasons, the Court should dismiss with prejudice Counts I and IV-VII and partially dismiss Counts II and III.[2]

## II.    RELEVANT BACKGROUND

### A.    The Debtors' Insolvency and the Chapter 11 Filings

As detailed in the *Declaration of Stuart Kaufman in Support of First Day Motions and Related Relief* [D.I. 4] (the "**Kaufman Declaration**"), Debtors' financial issues date back to at least late 2017 and included operational inefficiencies and the impact of the *Wayfair* decision, which required Debtors to accrue sales tax charges for goods they had sold in the past, which they did not do. *See* Kaufman Decl., ¶ 17.  As a result, Debtors defaulted on their secured loan facility and were required to obtain new replacement financing.  *Id.* at ¶¶ 18-19.  Such replacement financing included a $21 million term loan facility (the "**2018 Loan**") and certain second lien secured notes (the "**Second Lien Notes**") and warrants.  *Id.* at ¶¶ 19-20.  Money Chest LLC ("**Money Chest**") was a noteholder under one such Second Lien Note and perfected its liens thereunder.  *Id.*

Unfortunately, the issuance of the 2018 Loan and Second Lien Notes did not resolve Debtors' liquidity needs, which were compounded by issues with credit card processors, vendors, and subscribers that plagued Debtors.  *Id.* at ¶¶ 21-28.  Notably, as of the Petition Date, the Debtors estimated that they were over $5.87 million behind in sales tax payments.  *Id.* at ¶ 29.

Months prior to the Petition Date, the Debtors' financial condition worsened and, despite extensive marketing efforts, financial and strategic parties had little interests in Debtors' assets.

---

[2] Debtors state Counts VIII and IX against "John Doe" defendants and not Purchaser.  Accordingly, this motion only seeks to dismiss Counts I-VII.  To the extent such Counts are intended to be against a Non-Recourse Party, Purchaser reserves all rights and such claims would further terminate the already terminated Sales Tax Agreement.

*Id*. at ¶¶ 40-43. Money Chest ultimately purchased the 2018 Loan and provided postpetition financing to Debtors. *Id*. As a part of that transaction, Money Chest facilitated the release by the prior lender under the 2018 Loan of several hundred thousand dollars that had been held in suspense, and which funds were used for critical payments, including final employee payments. *Id*. at ¶ 43. But for Money Chest's actions, Debtors would have liquidated with over $5.87 million of unpaid sales taxes and significant unpaid employee liabilities.

On August 11 and 12, 2019, each of the Debtors filed a voluntary petition with this Court under Chapter 11 of Title of the United States Code.

During Debtors' bankruptcy cases, Money Chest—not Purchaser—provided debtor-in-possession financing that allowed Debtors to maintain operations and run a value-maximizing chapter 11 process. *See Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [D.I. 232] (the "**DIP Order**").

### B.    The Sale Process in the Chapter 11 Cases

On September 11, 2019, the Court entered the *Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Related Contract Assumption and Assignment Procedures, (C) Authorizing the Debtors to Enter into Stalking Horse Agreement and Approving Certain Bid Protections, (D) Scheduling a Sale Hearing, and (E) Granting Certain Related Relief* [D.I. 147] (the "**Bid Procedures Order**"). The Bid Procedures Order set forth a process to sell Debtors' assets, whereby Purchaser would be the stalking horse bidder. Ultimately, Purchaser was the only party to bid on Debtors' assets.

On October 1, 2019, the Court entered the *Order (A) Approving the Sale of Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [D.I. 254] (the "**Sale Order**"). The Sale Order approved the sale of substantially all of the Debtors' assets to Purchaser pursuant to that certain Asset Purchase Agreement, dated as of September 27, 2019, and as amended (the "**APA**"), and the transaction closed on October 1, 2019 (the "**Sale**"). The APA is attached hereto as **Exhibit A**.

As set forth in the Complaint, pursuant to the APA, Debtors agreed to transfer substantially all of their assets in exchange for Purchaser's agreement to, among other things, satisfy certain secured debt obligations, pay certain amounts, and assume certain significant liabilities, including the fulfillment of postpetition customer deposits. *See* APA § 2.6(a).

C.        **The Sales Tax Funding Commitment**

Debtors and Purchaser further entered into a funding commitment agreement at the closing of the Sale (the "**Sales Tax Agreement**"). *See* APA § 8.5(e). A true and correct copy of the Sales Tax Agreement, as amended and supplemented from time to time, is attached as Exhibit A to the Complaint [Adv. D.I. 1].

Pursuant to the Sales Tax Agreement, and assuming the Payment Plan Protocols set forth and defined in the APA and Sales Tax Agreement were met, Purchaser agreed to fund (directly or indirectly) certain amounts Debtors were obligated to pay under payment plans that Debtors finalized with various taxing jurisdictions on account of Debtors' pre-petition sales tax obligations on a non-recourse basis (the "**Payment Plans**"). *See* APA § 8.5(e)-(f). Purchaser did not assume any of Debtors' sales tax liabilities or payments under the Payment Plans. *See* APA § 2.4(c).

Debtors included twenty-six (26) Payment Plans as additional funding obligations under the Sales Tax Agreement. *See* APA § 8.5; Sales Tax Agreement §1. The twenty-six (26) Payment

Plans were negotiated by Debtors and provided for payments in excess of four million ($4,000,000); most of which were to be paid over time by Purchaser, on a non-recourse basis, pursuant to the Sales Tax Agreement.  Compl. ¶ 19.

Pursuant to section 7 of the Sales Tax Agreement, Debtors' recourse under the Sales Tax Agreement can only be against Purchaser, and no other entity or individual, including Joel Weinshanker who is expressly a Non-Recourse Party.  Specifically, section 7 provides that "no person other than Purchaser has any liabilities, obligations or commitments of any nature" under or in connection with the Sales Tax Agreement and only Purchaser shall have any obligations under the agreement.  Sales Tax Agreement, § 7.  Section 7 further states:

> that no recourse hereunder or under any documents or instruments delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, and no personal liability with respect thereto shall attach to, be imposed upon or otherwise be incurred by (a) any former, current or future equity holder, controlling person, director, officer, employee, agent, Affiliate, member, manager, general or limited partner, Representative or successor or assignee of Purchaser or (b) any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, Representative or successor or assignee of the foregoing (such Persons, collectively, but excluding Purchaser, the "**Non-Recourse Parties**"), whether by or through attempted piercing of the corporate veil, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law.

*Id.*

Section 3.3(b) of the Sales Tax Agreement provides that the agreement shall terminate automatically under certain circumstances that exist here, including Debtors' assertion that Purchaser has liability other than to fund cash payments under the Payment Plans and Debtors' threats of claims related to the agreement against Non-Recourse Part[ies] (defined below).  Specifically, section 3.3(b) states in relevant part that:

> This Agreement shall terminate, automatically and without any need for any action by any Person, upon the earliest to occur of the following: . . . (b) the date that any Seller Entity or any of their Representatives (i) asserts in any Action, litigation or other proceeding . . . (y) **that Purchaser has any liability under this Agreement other than to fund cash payments** (including penalties and interest with respect to any Defaulted Payments) **with respect to the Sales Tax Funding Commitment in accordance with the Payment Plans or. . . (ii) asserts, or threatens to assert, any claim against any Non-Recourse Party (as defined below) in connection with this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement (including in respect of any oral representations made or alleged to be made in connection therewith), whether in any Action, litigation or other proceeding, through counsel or in any other way**[.]

Sales Tax Agreement, § 3.3(b) (emphasis added).

Further, while the Sales Tax Agreement provides Debtors with the right *to seek* specific performance against Purchaser to cause Purchaser to satisfy its obligations under the Sales Tax Agreement, it does not, and indeed could not, guaranty that such remedy would be available as a matter of law.  *See* Sales Tax Agreement, § 4.

### D.    Alleged Breach of the APA and Sales Tax Agreement

Debtors allege that on November 18, 2021, they received a notice of default from the Attorney General's Office for the State of Texas.  The notice of default explained that the Comptroller had not received a tax payment pursuant to the Texas Payment Plan since on or about August 9, 2021 (the "**Texas Default**").  Compl. ¶ 27.

Debtors further allege that on November 18, 2021, Debtors' counsel, Bryan Cave Leighton Paisner LLP ("**BCLP**"), contacted counsel for Purchaser at Cooley LLP ("**Cooley**"), requesting that Purchaser immediately investigate and cure the default and confirm compliance with the Payment Plans for other states.  Compl. ¶ 29.

Cooley responded, as it did each time BCLP inquired, and advised BCLP that it would reach out to Purchaser and/or Mr. Weinshanker regarding the Texas Default. *See* Compl. ¶¶ 31-33, 36, 41.  Purportedly, based on these conversations, BCLP provided certain assurances to the State of Texas.  The Complaint does not allege that Cooley or Purchaser requested BCLP to reach out to the State of Texas regarding the Texas Default. *See* Compl. ¶¶ 35, 40.

On December 10, 2021, following a telephone conference with a member of Purchaser's accounting department, Purchaser's counsel provided the following update to BCLP: "Long story short is that there has been a lot of turnover at the company over the past months.  Ruby is no longer there and I don't think everything got communicated that should have before she left.  They are working to become current and I will follow up next week as well[.]"  Compl. ¶ 39.  Debtors allege that BCLP relied on this email and advised the Attorney General's Office for the State of Texas that Purchaser had a "stated intent to become current."  Compl. ¶ 40.

Almost a month after December 10, the Complaint alleges that for the first time a director of Purchaser reached out directly to an employee of Purchaser regarding the Texas Default.  Purchaser's employee, who was Purchaser's director of accounting, allegedly told Debtors' director that Purchaser had not made any payments pursuant to the Payment Plans for any state since August 2021.  Compl. ¶ 43.

Three days later, Mark Palmer (Debtors' Chief Transformation Officer) and Alexandre Zyngier (Debtors' Lead Independent Director) allegedly directly contacted Mr. Weinshanker, the primary principal of Purchaser.  Compl. ¶ 44.  Debtors allege that during that conversation, Mr. Weinshanker acknowledged Purchaser's current breach of the APA and the Sales Tax Agreement and indicated that Purchaser had no current intention of curing these breaches. Compl. ¶ 45.  The Complaint does not allege that any employee or principal of Purchaser refused to provide

information or provided inaccurate information regarding payments under the Payment Plans. Instead, the Complaint alleges that Purchaser's counsel relayed to BCLP that it was working with its client at BCLP's request, and the client was investigating the issues and considering how to become current under the Payment Plans.  Compl. ¶ 39.

The Complaint also alleges that as of December 31, 2021, approximately $2.6 million was remaining to be paid under the Payment Plans, of which approximately $800,000 in payments were delinquent.  Compl. ¶¶ 46, 54.  Given the initial Payment Plan obligations of approximately $4 million as stated in the Complaint, the Court can infer that pursuant to the Sales Tax Agreement, Purchaser has paid approximately $1.4 million of the Debtors' obligations under the Payment Plans.  Compl. ¶ 19.

On January 19, 2022, Debtors and their Boards of Directors (the "**Board**") purportedly sent a letter to Purchaser demanding that Purchaser cure all breaches under each of the Payment Plans and maintain compliance with such obligations while Debtors and Purchaser discuss a path forward in good faith (the "**Default Notice**").  Compl. ¶ 47.  A copy of the Default Notice is attached hereto as __**Exhibit B**__ and attached as <u>Exhibit G</u> to the *Declaration of Andrew Schoulder in Support of Plaintiffs' Motion for Preliminary Injunctive Relief Pursuant to Federal Rule of Bankruptcy Procedure 7065 and 11 U.S.C. §105* [Adv. D.I. 9] filed in this adversary proceeding.

The Complaint states that "[t]he [Default Notice] also cautioned that any party taking part in any diversion or distribution of assets from Purchaser to any affiliates of Weinshanker should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity that is having its assets diminished or 'wound down' for the benefit of insiders."  *Id.*  Specifically, the Default Notice states:

> Moreover, anyone taking part in any diversion or distribution of assets from [Purchaser] to any affiliates of Mr. Weinshanker or NECA should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity that is having its assets diminished or "wound down" for the benefit of insiders, as Mr. Weinshanker indicated is occurring.

Default Notice at 3; Compl. ¶ 48.

Debtors also alleged in the Default Notice "that Section 7 of the [Sales Tax Agreement] was not intended to (nor does it) ***absolve Mr. Weinshanker or his affiliates or constituents from breaching his payment obligations under the [APA]*** while transferring [Purchaser's] assets and/or business to affiliates to prevent the Debtors and other [Purchaser] creditors from seeking redress." Default Notice at 3 (emphasis added); *see also* Compl. ¶ 49.

On February 2, 2022, Debtors initiated this adversary proceeding by filing the complaint [Adv. D.I. 1] (the "**Complaint**").  Although Debtors also initially filed a motion for a preliminary injunction [Adv. D.I. 4], Debtors have taken no steps after the hearing on February 4, 2022 to conduct discovery or otherwise prosecute such request.

## ARGUMENT

A motion to dismiss pursuant to Rule 12(b)(6) is designed to test the sufficiency of the allegations in a complaint.  *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  The purpose of [Rule 12(b)(6)] is to allow the court to eliminate actions that are *fatally flawed in their legal premises and destined to fail*, and thus to spare litigants the burdens of unnecessary pretrial and trial activity."  *In re Aspect Software Parent, Inc.*, 578 B.R. 718, 722 (Bankr. D. Del. 2017) (emphasis added) (quoting *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993)).  "To survive a motion to dismiss, a complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"

*In re Aspect Software*, 578 B.R. at 722 (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). A "claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged conduct.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Court's review of a motion to dismiss is limited to the allegations in the complaint, any attached exhibits, any documents incorporated by reference, anything subject to judicial notice, and matters of public record. *Mosiman v. Madison Companies, LLC*, 2019 WL 203126, at *2 (D. Del. 2019) (citing *D.M ex rel. Ray v. Phila. Housing Auth.*, 613 F. App'x 187, 189 (3d Cir. 2015); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); and *El-Hewie v. Bergen Cty.*, 348 F. App'x 790, 794 (3d Cir. 2009)). For this motion, Purchaser relies on: (1) the allegations of Debtors' Complaint, which are presumed to be true only for the purposes of this motion; (2) Debtors' sworn statements in the underlying bankruptcy proceeding, which are subject to judicial notice; and (3) documents referenced in and which are integral to the Complaint.

## I.    Debtors Do Not Allege Breach of Any Requirement of the APA

The Court should dismiss Debtors' cause of action for breach of the APA (Complaint Count I, ¶¶ 56-67) because Debtors have not identified any specific provision of the APA that Purchaser failed to perform. The APA simply does not apply to post-closing events.

Under Delaware law, which governs the APA and Sales Tax Agreement, "to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Debtors allege (Compl. ¶ 59) that Purchaser breached the Purchase Price provision in APA § 2.6(a), which in relevant part states that Purchaser

would pay "the aggregate amounts payable by [Purchaser] pursuant to **Section 8.5** in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]." Debtors then allege that, by failing to pay sales taxes "pursuant to Section 8.5," Purchaser failed to perform a portion of the obligation to pay the Purchase Price and hence breached APA § 2.6(a). *See* Compl. ¶ 64.

However, Debtors misread the APA. Section 8.5 does not require payment of sales taxes, instead, it required that—as a condition closing—Purchaser and Seller would enter into the Sales Tax Agreement by which Purchaser would commit to pay Debtors' obligations under the Payment Plans on a non-recourse basis. *See* APA § 8.5(e). Purchaser fully complied with APA § 8.5—it entered the Sales Tax Agreement just as § 8.5 required. Indeed, the Complaint itself pleads that "[a]s a condition to closing and to satisfy the third component of the Purchase Price, the Plaintiffs and Purchaser entered into the [Sales Tax Agreement]." Compl. ¶ 64. Thus, Purchaser complied with § 2.6(e) and did not breach the APA.

The Court should reject Debtors' attempt to turn the APA's Purchase Price—a one-time payment—into a forward-looking covenant about future performance of the Sales Tax Agreement. None of the APA's representations and warranties, covenants, or closing conditions imposed any post-closing requirement that Purchaser pay Debtors' tax obligations. *See generally* APA §§ 6 & 7. The representations in the APA pertained to conditions at the time of closing. For instance, Purchaser represented it had sufficient funds available to pay the cash portion of the Purchase Price. APA § 4.5(e). Similarly, the APA included as a condition to Debtors' obligation to close only that Purchaser deliver an executed copy to the Sales Tax Agreement, which Purchaser did. *See* APA §§ 2.9, 10, 3(c). Even if the APA is misconstrued to impose a covenant about payment

obligations in the Sales Tax Agreement, those covenants had expired before Debtors notified Purchaser of their claim.[3]

Accordingly, Debtors have not alleged how Purchaser breached any representations or covenants in the APA, so the Court should dismiss Count I.

## II.    Debtors Have No Breach of Contract Claims for Obligations Accruing After the Sales Tax Agreement Automatically Terminated

The Court should partially dismiss Debtors' causes of action for breach of the Sales Tax Agreement (Complaint Counts II & III, ¶¶ 68-81) to the extent Debtors seek payment of amounts accruing after January 19, 2022 and/or February 2, 2022, because the Sales Tax Agreement—and thus Purchaser's obligations under the Sales Tax Agreement—terminated by its own terms on one of those dates.

In order for Purchaser to agree to undertake the significant risks associated with its purchase due to the Debtors' sales tax delinquencies, Debtors agreed (and this Court approved) that, as a material requirement of the Sales Tax Agreement, the Sales Tax Agreement would terminate automatically if Debtors ever asserted or threatened to assert any claims (1) against anyone other than Purchaser for obligations in connection with the Sales Tax Agreement or its contemplated transactions, or (2) against Purchaser for any obligations other than those created by the Sales Tax Agreement:

---

[3] The APA provides that Debtors must provide notice of any breach of a covenant not later than October 1, 2021, that is, 24 months after the closing date of October 1, 2019.  APA § 12.11.  Debtors allege that they first notified Purchaser of the alleged breach on November 18, 2021—a month and a half too late.  Compl. ¶ 65.

> This Agreement shall terminate, automatically and without any need for any action by any Person, upon the earliest to occur of the following: . . . (b) the date that any Seller Entity or any of their Representatives **(i) asserts in any Action, litigation or other proceeding . . . (y) that Purchaser has any liability under this Agreement other than to fund cash payments (including penalties and interest with respect to any Defaulted Payments) with respect to the Sales Tax Funding Commitment in accordance with the Payment Plans or. . . (ii) asserts, or threatens to assert, any claim against any Non-Recourse Party (as defined below) in connection with this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement** (including in respect of any oral representations made or alleged to be made in connection therewith), **whether in any Action, litigation or other proceeding, through counsel or in any other way**[.]

Sales Tax Agreement, § 3.3(b) (emphasis added). The plain purpose of § 3.3(b) was to constrain Debtors' ability to threaten (and thereby leverage a larger settlement of) wide-ranging lawsuits against third parties (such as Purchaser's principal or related entity) or to broaden any Non-Recourse Claims against Purchaser.

Nonetheless, Debtors did just what the Sales Tax Agreement barred, thereby terminating the Sales Tax Agreement.

### A.    Debtors Asserted Claims Against Purchaser's Principal and Related Entity for Obligations Under the Sales Tax Agreement

On January 10, 2022, Debtors learned that Purchaser had not paid certain amounts and would not be paying further amounts under the Sales Tax Agreement. Debtors' initial and quite negative reaction to that news came on January 19, 2022, by way of a letter from its counsel. It expressly threatened claims against Mr. Weinshanker and NECA:

> **[A]nyone** taking part in any diversion or distribution of assets from [Purchaser] to any affiliates of Mr. Weinshanker or NECA should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other **causes of action available to creditors** of an entity that is having its assets diminished or "wound down" for the benefit of insiders, as Mr. Weinshanker indicated is occurring.

Default Notice at 3 (emphasis added); Compl. ¶ 48 (emphasis added).

Debtors cannot escape the plain language of their letter. Using the terminology of § 3.3 of the Sales Tax Agreement, the January 19 letter "asserted" and/or "threatened to assert" "claims" against certain "Non-Recourse Parties." The threatened claims solely arise from the news that Purchaser was not paying, and would not be able to pay in full, its obligations "in connection with" or "contemplated by" in the Sales Tax Agreement. Furthermore, Debtors conjoined Mr. Weinshanker and Purchaser together; the letter referred to Purchaser's obligations under the Sales Tax Agreement as "his" (Mr. Weinshanker's personal) obligations. Default Notice at 3. Debtors unambiguously and purposefully threatened claims against Non-Recourse Parties in connection with the Sales Tax Agreement and the transactions contemplated therein.

The plain language of Debtors' January 19 letter triggered the automatic termination requirement of Sales Tax Agreement § 3.3—and, thus, as of January 19, 2022, the Sales Tax Agreement terminated and Purchaser had no further obligation to pay Debtors' obligations under the Payment Plans that accrued after that date.

## B. Debtors Asserted Claims Against Purchaser Beyond Its Payment Obligations Under the Sales Tax Agreement

Independently, and even if the Sales Tax Agreement did not terminate on January 19, 2022, the filing of Debtors' Complaint on February 2, 2022, automatically terminated the Sales Tax Agreement. In Count V of the Complaint, Debtors seek to equitably subordinate any of Purchaser's claims. Compl. ¶ 106. In Count VI, Debtors allege Purchaser is liable for fraud, for

which they seek compensatory and punitive damages.  Compl. ¶ 116.  Again using the language of § 3.3., the Complaint "asserts" in an "Action" and "litigation" that Purchaser has "liability . . . other than to fund cash payments" under the Sales Tax Agreement.  The plain language of Debtors' February 2 Complaint thus triggered the automatic termination requirement of Sales Tax Agreement § 3.3—and, thus, as of February 2, the Sales Tax Agreement terminated and Purchaser had no further obligation to fund amounts payable under the Sales Tax Agreement after such date.

## C.   Debtors Have No Valid Causes of Action for Payments Arising After Termination of the Sales Tax Agreement

Because the Sales Tax Agreement terminated, Debtors lack valid claims as stated for breach of contract in Counts II and III.

In Count II, Debtors seek damages for alleged breach of the Sales Tax Agreement for failure to pay taxes as they are accrued.  Compl. ¶ 72.  However, under Sales Tax Agreement § 1, "Purchaser shall have no obligation to fund, directly, or indirectly, any amounts upon the termination of this Agreement other than Defaulted Payments."  Therefore, the Sales Tax Agreement's termination on January 19 and/or February 2 abrogated Purchaser's obligation to fund Debtors' obligations under the Payment Plans that were not in default—meaning, not yet due—as of January 19 and/or February 2.  The Court should dismiss Count II to the extent it asserts any payment obligations due after those dates.[4]

In Count III, Debtors allege Purchaser breached the Sales Tax Agreement "by failing to provide evidence of payments made to each of the state taxing authorities pursuant to the Payment Plans."  Compl. ¶ 80.  Again, because the Sales Tax Agreement terminated automatically as of January 19 and/or February 2, Purchaser had no obligation to provide "evidence of payments" for

---

[4] Purchaser understands that about $800,000 of taxes were due before January 19, 2022.  That amount represents the value of Debtors' claim in Count II.

taxes accrued after those dates.  Debtors also do not allege, nor could they allege, how they were specifically damaged by a "fail[ure] to provide evidence."

The Court therefore should partially dismiss Counts II and III to the extent they seek damages for amounts payable after January 19 and/or February 2, 2022.

### III.    Debtors Cannot Seek Specific Performance of a Contract for Payment of Money

The Court should dismiss Debtors' specific performance count (Complaint Count IV, ¶¶ 82-92) because the Debtors have an adequate remedy at law and specific performance is not a standalone cause of action.

Specific performance is not available "[i]f the injury resulting from the breach of an agreement can be adequately compensated for in damages." *Barcroft Co. v. Bd. of Pub. Works of Town of Lewes*, No. CIV. A. 796, 1980 WL 81867, at *3 (Del. Ch. Mar. 11, 1980) (citing 71 AM.JUR.2d, Specific Performance § 10); *accord All. Compressors LLC v. Lennox Indus. Inc.*, No. CV 2019-0186-KSJM, 2020 WL 57897, at *3 (Del. Ch. Jan. 6, 2020) ("The party seeking an equitable remedy [such as specific performance] has the burden to show that a legal remedy would be inadequate."); *Epic/Freedom, LLC v. Aveanna Healthcare, LLC*, No. CV 2020-0908-JRS, 2021 WL 1049469, at *3 (Del. Ch. Mar. 19, 2021) ("Where 'money damages will suffice to remedy any alleged breach to date, and declaratory relief will establish the proper [procedure]' for payment of damages, there is no need for equitable relief.").

Debtors' claim, essentially, is that Purchaser breached contractual obligations to pay money (i.e., Debtors' obligations under the Payment Plans to state authorities).  Compl. ¶¶ 83, 85, 88.  The "specific performance" Debtors seek is merely performance of the contractual obligation to pay money.  Compl. ¶ 85, 88.  Debtors would be fully remedied by an award of monetary damages in the amount unpaid.  The Court should therefore dismiss Debtors' demand for specific

performance.  *See Epic/Freedom, LLC*, 2021 WL 1049469, at *5 (granting motion to dismiss or transfer to the superior court breach of contract claim for failure to pay sales tax refund because it is a legal claim that can be remedied by monetary damages); *Sun Life Assurance Co. of Canada - U.S. Operations Hldgs., Inc. v. Gp. One Thousand One, LLC*, 206 A.3d 261, 270-71 (Del. Super. Ct. 2019) (finding money damages would be adequate remedy if defendant refused to turn over tax refund in breach of operative contract); *see also Candlewood Timber Grp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997-98 (Del. 2004) (affirming Court of Chancery's dismissal of complaint that sought specific performance of contract requirement to obtain insurance to cover damage for lack of subject matter jurisdiction due to lack of equitable claim for relief, because plaintiff could adequately seek money damages, and did seek such damages, for producer's alleged breach of contract).[5]

## IV.    Debtors Fail to Allege Grounds for Equitable Subordination

The Court should dismiss Debtors' cause of action for Equitable Subordination (Complaint Count V, ¶¶ 93-106) because (1) Debtors fail to plausibly allege that Purchaser holds a claim against Debtors, much less an "allowed claim"; (2) Debtors do not allege "egregious" conduct sufficient to justify an equitable remedy; and (3) the allegedly inequitable conduct did not injure Debtors.

---

[5] Moreover, specific performance is an equitable remedy for an underlying cause of action not capable of remedy by money damages and not a cause of action unto itself. *See Addy v. Piedmonte*, No. CIV.A. 3571-VCP, 2009 WL 707641, at *23 (Del. Ch. Mar. 18, 2009) (noting plaintiffs requests for equitable remedies are "not claims in and of themselves, but types of remedies dependent on the viability and outcome of the underlying causes of action, such as those for breach of contract and equitable fraud."); *Wollard v. Yoder & Sons Constr., LLC*, No. CV 2020-0599-SG, 2021 WL 141984, at *1 n.7 (Del. Ch. Jan. 15, 2021) ("[Plaintiff] brings six "counts," but in addition to two claims sounding in contract and one in tort, the rest are not causes of action, but instead requests for remedies: specific performance, "temporary" injunction, and expedition.").

Under the doctrine of equitable subordination, a bankruptcy court can "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c). If Purchaser holds an "allowed claim" against Debtors, Debtors can validly seek to equitably subordinate Purchaser's claim where: "(1) '[t]he claimant must have engaged in some type of inequitable conduct;' (2) '[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;' and (3) '[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].'" *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir.2009) (alterations in original). For multiple reasons, Debtors have not alleged facts sufficient to justify equitable subordination.

First, Debtors have not alleged that Purchaser possesses any claim against Debtors that can be subordinated. Here, Purchaser—the only defendant on Count V—is simply that, a purchaser of Debtors' assets. Debtors' Complaint generically defines Purchaser's "Claims" as amounts to which Purchaser is entitled under the Convertible Notes and Pre-Petition Facility and with regard to the D&O litigation proceeds. As to the Convertible Notes and the Pre-Petition Facility, this Court can take judicial notice of the DIP Order entered in this case and the Kaufman Declaration wherein the Debtors admit that the Convertible Notes and Pre-Petition Facility are valid, senior, secured debt held by Money Chest LLC, not Purchaser. *See* Kaufman Declaration, ¶¶ 19-20, 36, 43 and DIP Order at ¶¶ E, 29, 35. With respect to the D&O litigation proceeds, this Court can similarly take judicial notice of Purchaser's free and clear purchase of these assets through the APA. *See* APA § 2.1(u). Debtors have not plausibly alleged that Purchaser holds a claim against the Debtors. Indeed, there is no "claim" of Purchaser to be subordinated.

Even if Purchaser had a "claim," Debtors have not alleged that it is an "allowed claim."  11 U.S.C. § 510(c) (emphasis added).  "'Allowed' is a term of art, referring to the Bankruptcy Court's determination that a claim is valid and in line for distribution."  *In re Insilco Tech., Inc.*, 480 F.3d 212, 216 (3d Cir.2007) (citing 11 U.S.C. § 502)).  "[O]nly those who possess allowed claims are entitled to distribution from the bankruptcy estate."  *Id.* (citation omitted).  "A claim will be considered allowed unless a party in interest objects."  *In re Tropicana Ent., LLC*, 520 B.R. 455, 475 (Bankr. D. Del. 2014) (citing 11 U.S.C. § 502(a)).  Debtors have not alleged that Purchaser has claims that are entitled to distributions from Debtors' estates or otherwise identify the claims which they seek to subordinate.  Lacking an allegation of an allowed claim, Debtors fail to state a claim for equitable subordination.  *See In re Tropicana Ent., LLC*, 520 B.R. at 475 (dismissing equitable subordination claim where count was "too vague and broad" because it failed to identify allowed claims that were sought to be subordinated).

Second, even if Purchaser had an "allowed claim," Debtors have not alleged any egregious conduct by Purchaser that could justify subordinating that claim.  Generally, equitable subordination applies to claimants who are insiders.  *See In re Jevic Holding Corp.*, No. 08-11006 BLS, 2011 WL 4345204, at *14 (Bankr. D. Del. Sept. 15, 2011) ("The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act.").  Where, as here, Purchaser is not an insider of Debtors, "then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary."  *Id.* (quoting *Schubert*, 554 F.3d at 412).  Essentially the sole basis of the allegedly inequitable conduct was Purchaser's counsel's short email on December 10.  As addressed at length below regarding Count IV for

fraud, that email certainly was not fraudulent, and in no way could the email be said to constitute "spoliation" or "overreaching."

Third, even if Purchaser had a claim against Debtors and even if the December 10 email is deemed to be egregious misconduct, Debtors still have no claim for equitable subordination because they suffered no damage from that email. Debtors allege their injury is from Purchaser's failure to make payments pursuant to the APA and the Sales Tax Agreement; the identical claims they would assert even if the December 10 email never existed. Debtors do not allege how that one-month delay caused them a direct injury.

Within Count V, Debtors inexplicably assert Purchaser's alleged liability to the Debtors' directors and officers. Compl. ¶ 105. Even if such implausible liability existed, the Complaint fails to allege how such liability injured Debtors or impacts potential recoveries to Debtors' creditors. *Cf. In re Diazo Serv. Co., Inc.*, 144 B.R. 771, 777-78 (Bankr. M.D. Tenn. 1992) (finding that chapter 11 debtor's failure to link inequitable conduct by creditors to any measurable injury to debtor or its creditors was fatal to debtor's equitable subordination claim).

## V.    Debtors Have Not Alleged a Valid Claim of Fraud Based on a Few Words in Purchaser's Counsel's December 10 Email That Caused No Injury

The Court should dismiss Debtors' cause of action for Fraud (Complaint Count VI, ¶¶ 107-116) for numerous reasons. Debtors allege that a single, terse email from Purchaser's counsel on December 10 "defrauded" them into taking no formal action for a month. The email occurred in the midst of a multiple-month exchange of emails and phone calls between the parties about Purchaser's payments under the Sales Tax Agreement. On January 10, Debtors learned that Purchaser had not made certain payments and would not be making further payments under the Sales Tax Agreement. Thus, the December 10 email, *at most*, arguably caused Debtors a one-month delay to confirm the status of tax payments. The fraud claim based on the December 10

email is without merit because Debtors do not plausibly allege (1) any duty to speak or falsity in counsel's email, (2) any reason counsel would have intended to defraud them, (3) any justification for relying on this single and short email, or (4) any injury from this one-month delay.

To validly allege a claim for fraud, Debtors must allege, *inter alia*, that (1) Purchaser falsely represented or omitted facts it had a duty to disclose; (2) Purchaser knew or believed that the representation was false or made the representation with a reckless indifference for the truth; (3) Purchaser intended to induce Debtors to act or refrain from acting; (4) Debtors acted in justifiable reliance on the representation; and (5) Debtors were injured as a result of this reliance. *See DCV Holdings, Inc. v. ConAgra Holding Inc.*, 889 A.2d 954 (Del. 2005). When alleging false representations, justifiable reliance and injury, "boilerplate and conclusory allegations will not suffice," and Debtors have an obligation to "accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Debtors' fraud claim fails every required element.

### A.    Debtors Have Not Alleged How They Were Injured

Even before critically analyzing the spartan allegations of fraud in the Complaint, the Court should dismiss Debtors' meritless claim for a simple and incontrovertible reason: Debtors have not alleged, nor can they plausibly allege, how they were injured by the December 10 email. The Complaint conclusorily alleges that "Debtors have incurred damages" without describing any specific injury. Compl. ¶ 114.

Debtors allege that the December 10 email caused them not to take any action to pursue their claims from December 10 to January 10. Compl. ¶ 113. Even assuming the December 10 email had that effect on Debtors, the Complaint lacks any factual allegation of how this one-month delay

injured Debtors.  Debtors do not allege (because it would not be true) that this one-month period subjected them to additional or different damages that are separate from their breach claim.  Had Debtors been informed on December 10 that no further payments under the Sales Tax Agreement would or could be made some events (such as the filing of Debtors' complaint) might have occurred earlier—but the claims at issue and the amount of damages Debtors seek would be unchanged.

Nor can Debtors allege that they were injured by advising the Texas tax authorities that Purchaser was intending to pay outstanding taxes.  Compl. ¶¶ 40, 42.  Such a statement by Debtors to Texas did not increase the amounts owed under the Sales Tax Agreement.

Lacking any plausible allegation of a cognizable and compensable injury from the December 10 email, Debtors lack a claim for fraud.  *See Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 159 (Del. Ch. 2003) (dismissing fraud claim, in part, for failure to sufficiently allege causational injury and finding that it was "not enough for the plaintiffs to complain that the defendants knowingly failed to disclose an important matter and then jump directly to the observation that the plaintiffs believe that collectively they are now $9.5 million dollars short in their assets."); *ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, No. CAN14C10236JRJCCLD, 2015 WL 3970908, at *5 (Del. Super. Ct. June 24, 2015) (dismissing fraud claim where plaintiff "pleads damages that are simply a 'rehash' of the breach of contract damages.").

**B.    Debtors Do Not Allege Purchaser's Counsel Had a Duty to Speak or Made a False Statement**

However, the Court should not give Debtors a free pass on their attempt to assert a federal case for fraud based on a couple of words in counsel's December 10 email.  Applying an iota of scrutiny to the Complaint, the Court should conclude that the email does not support a case for fraud.

First, Debtors do not allege Purchaser's counsel had any duty to speak. She responded to questions from Debtors, as part of an ongoing conversation. Debtors do not cite any contract obligation nor legal requirement that imposed a duty on Purchaser's counsel to send the December 10 email. Lacking a duty to speak, no claim of fraud can exist. *N. Penn Towns, LP v. Concert Golf Partners, LLC*, No. CV 19-4540-KSM, 2021 WL 3562849, at *13 (E.D. Pa. Aug. 12, 2021) (dismissing fraud and fraudulent concealment claims because the plaintiff failed to demonstrate that any of the defendants had a duty to speak).

Furthermore, nothing in the December 10 email was dishonest, let alone fraudulent. Counsel accurately disclosed the turnover of finance personnel within Purchaser and resulting confusion about the prepetition sales tax payments. The email stated the need to "follow up" with her client on these issues. Counsel did not instruct Debtors to take actions, or to rely on her email, or to communicate with Texas or any other state authorities.

Literally, Debtors' entire fraud claim depends on the few words in the December 10 email that counsel believed Purchaser's staff were "working to become current." The email offered no promise of if or when payments would be made. Furthermore, based on the acknowledgement that Purchaser's staff was entirely new and that counsel had to "follow up" on this point, Debtor had no basis to take these couple of words as a guarantee—subject to a potential fraud claim—that all outstanding tax payments would in fact be paid. Those few words are not a fraudulent communication.

## C.    Debtors Do Not Plausibly Allege an Intent to Fraudulently Induce Them

Even if the December 10 email's few words might be deemed to be misleading, Debtors have not alleged how or why counsel intended to defraud Debtors with those words. The specific circumstances of the December 10 email refute any notion of an intention to defraud.

Debtors do not allege any factual reason that Purchaser would have benefitted by making a misrepresentation on December 10 that it intended to pay the Debtors' obligations under the Payment Plans.  Only a month later, on January 10, Purchaser's principal told the Debtors' officer and director that Purchaser could not and would not make further payments under the Sales Tax Agreement.  Purchaser had nothing to gain by misleading Debtors for a month, and Debtors do not allege facts otherwise.  Furthermore, the wording of the December 10 email belies any intent to mislead: counsel acknowledges that Purchaser's staff was new and unaware of any obligations to pay the Debtors' prepetition sales taxes, and she had to follow up with them.  Finally, Debtors' allegations of numerous other communications between the parties negate any inference that the December 10 email was intended to defraud Debtors.  Debtors allege an almost two-month dialogue between counsel to the Purchaser and Debtors regarding the sales tax payments, in which Debtors continued to ask questions for a month after the December 10 email.  Compl. ¶ 41.  At no point during this time did the Debtors receive an assurance of payment.

Although a defendant's intent is usually not resolved on a Rule 12 motion, the factual allegations here conclusively belie any such intent by Purchaser.  *Mooney v. Pioneer Nat. Res. Co.*, No. CV N17C-01-225 RRC, 2017 WL 4857133, at *7 (Del. Super. Ct. Oct. 24, 2017) (dismissing fraud complaint for, *inter alia*, failure to adequately plead intent and finding "Plaintiff's argument is essentially that intent may be inferred because Defendant allegedly made false statement. While the Court recognizes that the particularity requirement is lessened for pleading a state of mind such as intent, it cannot accept Plaintiff's reasoning on this point . . . Plaintiff does not adequately plead "circumstantial evidence of conscious misbehavior," let alone "strong circumstantial evidence" of the same.").

**D.      Debtors' Allegations Do Not Constitute Justifiable Reliance**

Finally, even if the Court accepts Debtors' bald allegations of intent to defraud, Debtors have not sufficiently alleged their "justifiably reliance" on the December 10 email.

To "justifiably rely" on an allegedly false communication, Debtors must allege that they "'did not have either the awareness or opportunity to discover the accurate information.'" *Fortis Advisors LLC v. Johnson & Johnson*, No. CV 2020-0881-LWW, 2021 WL 5893997, at *13 (Del. Ch. Dec. 13, 2021) (citation omitted).   A "sophisticated party" like Debtors "generally cannot justifiably rely on extra-contractual representations that could have been discovered with adequate due diligence." *Id.*

Defendants have not alleged how they justifiably relied solely on a few short words from Purchaser's outside counsel on December 10.   In the email, counsel advised Debtors that she needed to later follow up with her client; Debtors thus knew Purchaser's counsel was not speaking authoritatively for Purchaser in that email.   Any reliance on that email alone was not justified.

Furthermore, Debtors certainly had "opportunity" to make other inquiries.   From November 18, 2021 to January 7, 2022, the Complaint alleges that the totality of the Debtors' diligence regarding the issue included nine emails to Purchaser's counsel that each received short and generic responses.   Debtors then demanded, and Purchaser granted, the January 10 meeting.   In short, the Complaint not only fails to allege justifiable reliance, it pleads facts showing that Debtors *in fact did not rely* on Purchaser's counsel's statement.

Taking all these alleged facts into account, Debtors have not validly alleged that they justifiably relied on the December 10 email.   *See Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, No. CV 2018-0059-JRS, 2020 WL 881544, at *36 (Del. Ch. Feb. 24, 2020) (dismissing fraud claim for failure to plead reasonable reliance and finding, "[a]s relates to the fraud claims, this is an example

of a complaint that pleads itself 'out of court by alleging information that defeats [its] claim.'

Plaintiffs have not pled justifiable reliance with particularity under Court of Chancery Rule 9(b).");

*Mooney*, 2017 WL 4857133, at \*8 (dismissing fraud complaint for, *inter alia*, failure to adequately

plead justifiable reliance, finding "Plaintiff has not pled with particularity that he justifiably relied

on Defendant's alleged misrepresentations because he fails to plead with particularity just how he so

relied.").

    For these many foregoing reasons, Debtors fail to allege a valid claim for fraud.

## VI.    Debtors Cannot Assert a Claim of Unjust Enrichment

    Finally, the Court should dismiss Debtors' cause of action for Unjust Enrichment

(Complaint Count VII, ¶¶ 117-121) because (1) Debtors allege an enforceable written contract and

(2) Debtors can be made whole by money damages.

    First, because no doubt exists that written contracts govern the subject of Debtors' claims,

Count VII fails.  Unjust enrichment provides a quasi-contractual remedy in "the *absence* of a

formal contract." *Pedrick v. Roten*, 70 F. Supp. 3d 638, 652 (D. Del. 2014) (quoting *ID Biomedical

Corp. v. TM Techs.*, 1995 WL 130743, at \*15 (Del. Ch. Mar. 16, 1995) (emphasis added));

*Bakerman v. Sidney Frank Importing Co.*, No. CIV.A. 1844-N, 2006 WL 3927242, at \*18 (Del.

Ch. Oct. 10, 2006) (emphasis added).  For such a claim to survive dismissal, the validity of the

formal contract must be in doubt or uncertain—but where, as here, "the complaint alleges an

express, enforceable contract that controls the parties' relationship . . . a claim for unjust

enrichment will be dismissed." *Bakerman,* 2006 WL 3927242, at \*18 (citing authority).  Debtors'

Count VII fails this test.  Debtors allege that two written contracts govern the parties' relationship.

*See, e.g.*, Compl. ¶¶ 57, 69.  Indeed, Debtors cannot describe their Unjust Enrichment claim

without reference to the written contracts; they describe that the allegedly "unjust enrichment" is

"Purchaser's breach of the Sales Tax Funding Commitment."  Compl. ¶ 119.  Consequently, the Court should dismiss Count VII.  *See, e.g.*, *In re Abound Solar Mfg., LLC*, 547 B.R. 611, 623 (Bankr. D. Del. 2016) (dismissing unjust enrichment claim because it was based on the same subject matter covered under the applicable agreement); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (affirming dismissal of unjust enrichment claim on the ground that claim was governed by contract and noting "Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract"); *Bakerman,* 2006 WL 3927242, at *18 (dismissing unjust enrichment claim where complaint alleged existence of valid, governing contract).

Second, if their claims had any merit (and they do not), Debtors would have a legal remedy.  Unjust enrichment is available only in "the absence of a remedy provided by law."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010); *accord All. Compressors LLC*, 2020 WL 57897, at *3 (Del. Ch. Jan. 6, 2020) (for unjust enrichment, plaintiff has "the burden to show that a legal remedy would be inadequate.").  Debtors seek legal damages in Counts I, II, III, and VI.  An award under any of these causes of action would fully satisfy Debtors.  Count VII is superfluous.

## <u>CONCLUSION</u>

For these reasons, The Loot Company respectfully requests that this Court grant this motion and dismiss with prejudice Counts I and IV through VII, partially dismiss Counts II and III, and grant such other relief as is just and proper.

Dated:  March 7, 2022
         Wilmington, Delaware

BAYARD, P.A.

*/s/  Erin R. Fay*
Erin R. Fay (No. 5268)
Steven D. Adler (No. 6257)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Phone: (302) 655-5000
Email: efay@bayardlaw.com
        sadler@bayardlaw.com

COOLEY LLP
Cathy Hershcopf (*Admitted pro hac vice*)
Lauren A. Reichardt (*Admitted pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Email: chershcopf@cooley.com
        lreichardt@cooley.com

*Attorneys for the Loot Company*
*(f/k/a Loot Crate Acquisition LLC)*