## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

---

| | | |
|---|---|---|
| | § | |
| Old LC, Inc. (f/k/a Loot Crate, Inc.), Old | § | |
| LC Holdings, Inc., Old LCF, Inc., and | § | |
| Old LC Parent, Inc., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 22-50107 (BLS) |
| | § | |
| The Loot Company (f/k/a Loot Crate | § | |
| Acquisition LLC), Loot (Assignment | § | |
| for the Benefit of Creditors), LLC, and | § | |
| John Doe, | § | |
| | § | |
| Defendants. | § | |

### FIRST AMENDED COMPLAINT

Plaintiffs Old LC, Inc.; Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc.

(collectively, "***Debtors***" or "***Plaintiffs***")[2] bring this action and respectfully allege as follows:

---

[1]     Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  Debtors' noticing address in their Bankruptcy Cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

[2]     Debtors were formerly named Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc.  Following the closing of the sale of substantially all of Debtors' assets, Debtors filed the necessary documentation in the applicable jurisdictions to change their corporate names and filed the *Notice of Changes of Debtors' Names and Case Caption* [D.I. 265 in the Bankruptcy Cases] with the Court, all in accordance with the terms of the Sale (as defined below) and this Court's order approving the same [D.I. 254 in the Bankruptcy Cases].

## Nature of the Action

1.     Debtors bring this action to vindicate their rights and those of their bankruptcy estates against the company that purchased their assets in a Court-approved sale under Section 363 of the Bankruptcy Code.  Because Purchaser (as defined below) has repudiated its agreement to pay certain pre-petition sales taxes, which was a fundamental component of the purchase price (and indeed, the very agreement) in the prior transaction between Debtors and Purchaser, Debtors seek specific performance, damages for breach of contract, equitable subordination, setoff, and related relief.  In addition, because Purchaser has made known its intent to transfer part or all the business it acquired from Debtors to one or more affiliates, evidently to protect itself against a judgment in favor of Debtors, Debtors seek to avoid and recover fraudulent transfers by Purchaser. Indeed, and as discussed below, due to the breach of the term sheet, the Purchase Agreement (as defined below), and Sales Tax Funding Commitment (as defined below), neither Purchaser nor Loot ABC (as defined below) is entitled to the benefits thereof.

2.     An original version of this First Amended Complaint was filed on February 2, 2022, initiating this Adversary Proceeding.  *See* D.I. 1 in this Adversary Proceeding.  However, at or near the same date, Purchaser assigned substantially all of its assets to Loot (Assignment for the Benefit of Creditors), LLC ("***Loot ABC***").  Loot ABC and Purchaser have agreed that Loot ABC is now the owner of an interest in property of Debtors.  Specifically, as discussed below, Purchaser had a claim to property of Debtors:  a portion of certain proceeds of litigation being brought on behalf of Debtors' estates against Debtors' former directors and their affiliates, under a binding term sheet as approved by this Court.  As such, and because Loot ABC is now the holder of that interest and claim, Loot ABC is joined as a party to this action as to certain counts, including Debtors' right of setoff, and breach of the term sheet.  Due to breach of the term sheet, neither

Purchaser nor Loot ABC is entitled to the benefits thereof.  And further, to the extent that **despite** Purchaser's prior breach of the binding term sheet, Purchaser is entitled to any amounts from such litigation, Debtors may set off against such recovery the amounts Purchaser owes under the Sales Tax Funding Commitment (as defined below).  And so, if Loot ABC is now the holder of any claim to litigation proceeds, it would be subject to the same setoff Debtors seek against Purchaser.

## Jurisdiction and Venue

3.      This adversary proceeding arises in and relates to Debtors' Chapter 11 cases (the "***Bankruptcy Cases***").

4.      This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (E), (H), and (O).  To the extent any part of this adversary proceeding is determined not to be a core proceeding, Plaintiffs consent to the entry of final orders or judgments by the Court.

5.      Venue is proper under 28 U.S.C. § 1409 because this adversary proceeding arises under title 11 or arises in or relates to the Bankruptcy Cases.

6.      The statutory predicates for the relief requested herein are found in §§ 105 and 510(c) of Title 11 of the United States Code (the "***Bankruptcy Code***"), as well as the Delaware Uniform Fraudulent Transfer Act and Federal Rules of Bankruptcy Procedure 6004, 6009, and 7001(1), (7), and (8).

## The Parties

7.      Plaintiffs are Chapter 11 debtors and debtors-in-possession in the above-captioned jointly administered Bankruptcy Cases.

8.     The Loot Company, f/k/a Loot Crate Acquisition LLC ("***Purchaser***") is a Delaware limited liability company with its principal offices located in New York, New York.  Pursuant to Section 12.1 of the Purchase Agreement (defined below), Purchaser does not identify any address but instead lists the offices of Cooley LLP c/o Cathy Hershcopf and Robert Winning (although Mr. Winning appears no longer to be affiliated with the Cooley law firm), 55 Hudson Yards, New York, New York 10001.  Purchaser's registered agent is The Delaware Corporation Agency, Inc., 600 N. King Street, Suite 400, Wilmington, Delaware.

9.     Upon information and belief, and as further discussed below, Debtors have grounds to believe that multiple parties may have benefited from (and/or continuing to benefit from) certain conduct complained herein.  Likewise, upon information and belief, Purchaser does not have any direct employees but is instead directed by employees of an affiliate shared-services entity that houses employees that direct and oversee the operations of both Purchaser and other affiliated entities owned by Mr. Joel Weinshanker ("***Weinshanker***").  As such, upon further discovery, Debtors will seek to further amend this First Amended Complaint to include all persons and parties that authorized, directed, aided and abetted, intentionally omitted disclosure of and/or falsely represented material information, and/or benefited from certain conduct complained herein.

10.     Loot ABC is a California limited liability company, formed on January 20, 2022.  Loot ABC's mailing address is 3945 Freedom Circle, Suite 560, Santa Clara, California  95054, and its agent for service of process is c/o Michael Maidy, at that same address.

### General Allegations

11.     On August 11 and 12, 2019 (the "***Petition Date***"), each of Plaintiffs filed a voluntary petition with this Court under Chapter 11 of Title 11 of the United States Code (the

"**Bankruptcy Code**"), to initiate the Bankruptcy Cases.  The Bankruptcy Cases are consolidated for procedural purposes only and administered jointly.

12.    Plaintiffs are authorized to continue to operate and manage their businesses and assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### Purchaser's and Its Affiliates' Conduct and Structure in Relation to Debtors

13.    Purchaser was not a stranger to Debtors when Debtors filed their Bankruptcy Cases. To the contrary, on August 3, 2018, a little more than a year before the Petition Date, Money Chest LLC ("**Money Chest**"), which is an affiliate of Purchaser, loaned Debtors $2.5 million in subordinated debt.  The promissory note for this debt was signed by Weinshanker, who is and was a principal of Money Chest, and of Purchaser.

14.    Weinshanker is also a principal of National Entertainment Collectibles Association, Inc. ("**NECA**").  NECA makes and manufactures a variety of licensed toys, figurines, and trinkets that appeal to the typical pop culture or fantasy enthusiast.  As such items would be a natural outlet for Debtors' loot boxes and collectible sets, the investment by Money Chest, as an affiliate of NECA, made sense to both parties.

15.    Just prior to the Petition Date, Money Chest acquired the then-existing senior debt owed by Loot Crate, from a lender known as Midtown Madison Management LLC.  This acquisition of the so-called "First Lien Loan Agreement Claims" was to facilitate a credit bid for Debtors' assets in their bankruptcy case.

16.    In addition, contemporaneously with the Petition Date, Weinshanker formed Purchaser, under its original name of Loot Crate Acquisition LLC.  In the meantime, Money Chest made a post-petition loan (the "**DIP Loan**") to Debtors, approved by this Court, of up to $10 million.

**The Sale of Debtors' Assets to Purchaser**

17.     On October 1, 2019, the Court entered the *Order (A) Approving the Sale of Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [D.I. 254 in the Bankruptcy Cases] (the "**Sale Order**").  The Sale Order approved the sale of substantially all of Debtors' assets to Purchaser pursuant to that certain Asset Purchase Agreement, dated as of September 27, 2019, and as amended (the "**Purchase Agreement**," a copy of which is attached as Exhibit A to the Sale Order), and the transaction closed as of October 1, 2019 (the "**Sale**").

18.     It appears that NECA, Purchaser, and Money Chest, all controlled by Weinshanker, were more or less intertwined for purposes of the Sale.  Specifically, Purchaser used **Money Chest's** claims against Debtors to fund part of **Purchaser's** consideration.  Section 2.6 of the Purchase Agreement reflects that **Purchaser** is surrendering **its** claims under the First Lien Loan Agreement (although such claims had been originally bought by Money Chest), and Purchaser is surrendering **its** claims under the DIP Loan (although such claims were originally owed to Money Chest).  The surrender of such claims was collectively up to a total amount of $30 million.

19.     Moreover, as Debtors' Bankruptcy Cases progressed post-sale, Purchaser and Money Chest always acted as if they were the same, at least in terms of holding any remaining claims against or rights in Debtors.  For example, in the months leading up to the global settlement embodied by the term sheet among Debtors, Purchaser, and the Committee (as defined below), various draft term sheets among the parties indicated that Purchaser and Money Chest treated their rights and interests jointly.  The term sheets were subject to heavy review and commentary by the law firm of Cooley LLP, which was counsel to all of Purchaser, Money Chest, NECA, and Weinshanker.  Moreover, in the final term sheet approved by this Court allocating the interests in

Debtors' D&O action, "TLC" (aka The Loot Company, which is the Purchaser) is used as the collective term for any claims or rights of Purchaser and of Money Chest. In all events, it appeared that Purchaser and Money Chest treated themselves, and Cooley treated them as well, as more or less interchangeable.

20.     Regardless, pursuant to the Purchase Agreement, Debtors agreed to the transfer of substantially all of their assets in exchange for Purchaser's agreement to, among other things, pay the following Purchase Price: (i) as noted above, $30 million payable in the form of a credit bid; (ii) a cash component described as the Budgeted Reserve; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]" (the "***Purchase Price***"). *See* Purchase Agreement § 2.6(a).

21.     Purchaser satisfied items (i) and (ii) of the Purchase Price.

### The Sales Tax Funding Commitment

22.     As noted above, as a condition to closing and in order to satisfy item (iii) of the Purchase Price, Debtors and Purchaser entered into a funding commitment agreement at the closing of the Sale (the "***Sales Tax Funding Commitment***"). *See* Purchase Agreement §8.5(e). A true and correct copy of the Sales Tax Funding Commitment, as amended and supplemented from time to time, is attached hereto as <u>Exhibit A</u>.[3]

23.     Pursuant to the Sales Tax Funding Commitment, and assuming the Payment Plan Protocols set forth in the Purchase Agreement and Sales Tax Funding Commitment were met, Purchaser committed to pay (directly or indirectly) the payments arising under payment plans

---

[3]     The exhibits to the Sales Tax Funding Commitment – the actual payment plans – were authorized to be filed under seal, *see* D.I. 26 in this Adversary Proceeding, and so to avoid undue re-filing and docket clutter, only the Sales Tax Funding Commitment itself is attached.

Debtors finalized with various taxing jurisdictions on account of Debtors' pre-petition sales-tax obligations (the "***Payment Plans***").  *See* Purchase Agreement § 8.5(e)-(f).

24.      In order for the Payment Plans to become a funding obligation under the Purchase Agreement, the Payment Plans were to meet the criteria of the Payment Plan Protocols.  *See* Purchase Agreement § 8.5(b), (f).  The Payment Plan Protocols provided detailed parameters within which the Payment Plans had to remain.  Generally speaking, if the total amount owed to the state taxing authority was $50,000 or less, the Payment Plan could be comprised of payments over a period of up to six (6) months, but if the total amount owed to the state taxing authority was greater than $50,000 then the Payment Plan had to be comprised of payments over a thirty-six (36) month period and the total amount (excluding applicable interest and penalties) could be no greater than one hundred ten present (110%) of the estimated amount set forth on the Sales Taxes Schedule, which is attached to the Purchase Agreement at Schedule 8.5(a)(i).  *See* Purchase Agreement § 1.1(xx); Schedule 8.5(a)(i).

25.      Debtors originally had up to nine (9) months after the Sale closed to enter into Payment Plans pursuant to the Payment Plan Protocols.  Purchase Agreement §8.5(f).  Due to the COVID-19 pandemic, many state agencies shut down making it impossible for Debtors to finalize Payment Plans with those states.  Even with the hurdles associated with the COVID-19 pandemic, Debtors were able to finalize Payment Plans with all but four (4) states' taxing authorities prior to expiration of the original nine (9) month deadline.  At Debtors' request, Purchaser provided Debtors a short extension to enter into Payment Plans with the remaining state taxing authorities. *See* Amendment of Section 8.5(f) of the Purchase Agreement.[4]

---

[4]      The Amendment of Section 8.5(f) of the Purchase Agreement (the "***Amendment***") lists six (6) states for which Debtors were to receive an extension.  This is because at the time Debtors

26.     In accordance with the Purchase Agreement, the Sales Tax Funding Commitment, and the *Court's Order Granting Motion of Debtors for Omnibus Procedures By Which The Debtors Will Be Authorized to Negotiate and Settle Certain Tax Claims* [D.I. 369 in the Bankruptcy Cases], Debtors and their professionals negotiated with twenty nine (29)[5] state taxing authorities.

27.     After expending an inordinate amount of time and resources towards finalizing the Payment Plans, Debtors were able to include twenty six (26) Payment Plans as additional funding obligations under the Sales Tax Funding Commitment.  *See* Purchase Agreement § 8.5; Sales Tax Funding Commitment § 1.  The Payment Plans that became additional funding obligations under the Sales Tax Funding Commitment are the following taxing jurisdictions: Alabama, Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Nebraska, New York, North Carolina, Pennsylvania, Texas, Utah, Vermont, Washington, and Wisconsin.

28.     The twenty six (26) Payment Plans totaled more than four million ($4,000,000) in additional funding obligations under the Sales Tax Funding Commitment; most of these amounts were being paid over time by Purchaser pursuant to the Sales Tax Funding Commitment.

29.     Accordingly, pursuant to Section 8.5 of the Purchase Agreement and Section 1 of the Sales Tax Funding Commitment, Purchaser "commit[ted] to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment

---

began negotiating the Amendment, there were six (6) states remaining; however, upon execution of the Amendment, Debtors had finalized Payment Plans with two (2) of those six (6) states.

[5]     This number is larger than the number of Payment Plans Debtors ultimately entered into. This is because Debtors were unsuccessful in their attempts to enter into a Payment Plan with South Carolina, and during Debtors' negotiations with North Dakota and New Jersey, Debtors determined no sales taxes were owed to either taxing jurisdiction.

obligations of the [Debtors] . . . as such individual payments [became] due under the Payment Plans." Sales Tax Funding Commitment § 1.

30.     To the extent that Purchaser elected to satisfy a Payment Plan by direct payment to the applicable taxing authority, Section 2 of the Sales Tax Funding Commitment required Purchaser to provide to Debtors written documentation evidencing such payment was made to the applicable state.

31.     Given the materiality of the Sales Tax Funding Commitment obligation as a condition to the Sale, Debtors specifically negotiated for the right of specific performance by which Debtors maintain the right to cause Purchaser to satisfy its obligations under the Sales Tax Funding Commitment, plus the costs and expenses incurred by Debtors in seeking such relief. Sales Tax Funding Commitment § 4.

32.     Debtors fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent to Purchaser's obligations have been satisfied

**<u>Purchaser's Breach of the Purchase Agreement and Sales Tax Funding Commitment</u>**

33.     Between the closing of the Sale and approximately November 1, 2021, Debtors and Purchaser maintained regular communications regarding, among other things, the pending litigation being pursued by the Official Committee of Unsecured Creditors of Debtors (the "***Committee***") against certain directors and their affiliates (the "***D&O Litigation***"), as well as Purchaser's commitment to fund $75,000 as liquidating trust costs for certain operating costs pursuant to that certain binding term sheet approved by the Court's Order Granting Motion of the Official Committee of Unsecured Creditors (I) Granting Standing and for Authority for the

Creditors Committee to Prosecute Certain Claims, and (II) Approving a Term Sheet Among Debtors, Committee, and Purchaser [D.I. 714 in the Bankruptcy Cases] ("*Term Sheet Order*").

34.     Pursuant to the Term Sheet Order, Purchaser will receive (or would have received, to the extent its breach affects its rights, or alternatively now that Purchaser is purportedly insolvent, Loot ABC may or may not be entitled to) D&O Litigation proceeds at different levels in the priority waterfall in exchange for Purchaser's assignment and transfer of any and all claims it purchased via the Purchase Agreement (the "*Claim for D&O Litigation Proceeds*").  As noted above, Purchaser (either on its own or jointly with Money Chest) held an unsecured deficiency claim under the First Lien Loan Agreement and the original Money Chest pre-petition $2.5 million note owed by Debtors, both of which were converted into claims under the term sheet waterfall to property of Debtors.

35.     To date, Purchaser's funding of the $75,000 for liquidation trust costs pursuant to the Term Sheet has not been triggered, so Purchaser does not currently have any rights to the First Tier Obligations (as defined in the Term Sheet).  Purchaser (or Loot ABC) may, however, have rights to the Fourth, Sixth, and Seventh Tier Obligations.

36.     On November 18, 2021, Debtors received a notice of default from the Attorney General's Office for the State of Texas.  Specifically, the notice of default explained that the Comptroller had not received a tax payment pursuant to the Texas Payment Plan since on or about August 9, 2021 (the "*Texas Default*").

37.     Prior to receiving the Texas Default, Purchaser had not provided to Debtors nor their professionals any previous notice of such breach.

38.     Upon receipt of the Texas Default communication, Debtors' counsel, Bryan Cave Leighton Paisner LLP ("*BCLP*") immediately contacted counsel for Purchaser at Cooley LLP

("***Cooley***"), Cathy Hershcopf and Lauren Reichardt, requesting that Purchaser immediately look into and cure the default.  Additionally, Debtors' counsel requested that Purchaser also confirm that Purchaser is compliant with the Payment Plans for other states.

39.     Cooley confirmed receipt of BCLP's request that same day.

40.     On November 23, 2021, BCLP emailed Cooley again to confirm whether Cooley or Purchaser was in communication with the Office of the Attorney General for the State of Texas to address the Texas Default.  In response, Cooley stated "We have contacted our client, but have no intention of talking directly to TX."

41.     Following this response, BCLP emailed Cooley again for clarification on November 23, 2021, as follows, "Cooley has not [sic] intention and [Purchaser] has no intention? OR Cooley has no intention? Has someone paid the bill? We can't ignore the Texas in light of the default – SOMEONE needs to tell them something. So at minimum, we need to know what is being done to cure."  In response, Cooley indicated, "Lauren promptly contacted the client about the delayed payment. **I will reach out personally to Joel [Weinshanker]** before the holiday, but not until my deposition is over. **Neither Cooley, nor [Purchaser] will contact Texas**" (emphasis added).

42.     On November 30, 2021, after receiving an inquiry from the State of Texas, BCLP again contacted Cooley on the status of their inquiry and were told, "I reached out to **Joel [Weinshanker] again**" (emphasis added).

43.     After still not receiving an update from Cooley or Purchaser, BCLP again contacted Cooley, on December 2, 2021, for an update, stating:

> Hi Cathy and Lauren – any update?
>
> Chris Murphy from the Texas Comptroller called me this afternoon to see where things stand. He indicated that he is not looking to accelerate and

unwind the settlement, but his discretion is going to slowly slip way unless things are resolved and brought back into compliance.

**I understand that you don't want Cooley and [Purchaser] directly interfacing with Texas, that's okay. I'm happy to do it. But in making me the middle man, I just ask that you help me out here so I'm not in a very awkward and compromising position. Hope you can appreciate that.**

(emphasis added).

44.    By virtue of the foregoing, Cooley and Purchaser had express knowledge that BCLP was relying on the accuracy of information provided by Cooley and Purchaser to update the State of Texas in light of the refusal by Cooley and Purchaser to do so.  BCLP, in reliance on the updates from Cooley, assured the State of Texas that Cooley and Purchaser were looking into the Texas Default.

45.    In response, that same day on December 2, 2021, Cathy Hershcopf again responded, stating "I pinged **Joel [Weinshanker]** again and Lauren reached out [Purchaser]" (emphasis added).

46.    During this period, in addition to the repeated requests for Cooley to provide an update on the status of the Texas Default, BCLP also requested confirmation as to whether or not Purchaser was in compliance with other Payment Plans.

47.    On December 10, 2021, BCLP asked Cooley for an update on the status of Purchaser's review.  In this communication, BCLP reemphasized that this information was being conveyed to the State of Texas in order to keep the Attorney General's Office apprised of the situation, stating, "Cathy/Lauren – I was able to preempt Texas from asking for a status update by reporting that you were meeting with [Purchaser]. Do you have an update? I rather not get on the phone with Texas next week until I have something substantive to him. Thanks."

48.     That same day, Lauren Reichardt at Cooley responded, "Long story short is that there has been a lot of turnover at the company over the past months.  Ruby is no longer there and I don't think everything got communicated that should have before she left.  **They are working to become current and I will follow up next week as well**" (the "*December 10th Communication*") (emphasis added).

49.     In reliance on the December 10th Communication, BCLP explained via phone and email to the Attorney General's Office for the State of Texas that the person who had the institutional knowledge and was responsible for making the Payment Plan payments at Purchaser was no longer with Purchaser, which is why payments came to a halt and no one identified the issue.  BCLP also advised the Attorney General's Office of Purchaser's stated intent to become current on the payment plan.

50.     Between December 17, 2021 and January 3, 2022, BCLP continued to follow up with Cooley on the status of the Texas Default.  BCLP was told by Cooley that Purchaser was still going through the documents and knew that it owed Debtors a response on December 17, 2021; that Cooley would follow up again on December 20, 2021; and that Cooley would try to follow up with Purchaser on January 3, 2022.

51.     In further reliance of the December 10th Communication and these subsequent communications from Cooley, BCLP continued to act as the "middle man" and pass along the Cooley reports to the State of Texas.

52.     On January 7, 2022, Chris Davis, a member of Debtors' board of directors and former consultant to Purchaser, contacted Janna Deal at Purchaser to verify that this information was correct.  Mrs. Deal, who is the director of accounting at Purchaser, told Mr. Davis that

Purchaser had not made any payments pursuant to the Payment Plans for any state since August 2021.

53.     In light of the foregoing, on January 10, 2022, Mark Palmer (Debtors' Chief Transformation Officer) and Alexandre Zyngier (Debtors' Lead Independent Director) contacted Weinshanker, the primary principal of Purchaser and its affiliates, including parent company, National Entertainment Collectables Association, Inc. (as noted above, "***NECA***").

54.     During that conversation, Weinshanker acknowledged Purchaser's current breach of the Purchase Agreement and the Sales Tax Funding Commitment and indicated that Purchaser had no current intention of curing these breaches.  Weinshanker stated that he had been taking certain measures to "wind down" Purchaser's business. When specifically pressed, Weinshanker confirmed that he was not ceasing the whole business of Purchaser, but was instead "shifting" parts of the business to other entities controlled by NECA.  Weinshanker also stated that he intended to use Purchaser's revenues and inventory to repay his capital injections into Purchaser, which Weinshanker characterized as secured loans that he and/or NECA had advanced to Purchaser.

55.     Based upon information provided by Cooley on January 14, 2022 at 3:30 pm and January 18, 2022 at 3:30 pm (EST), Debtors understand that Purchaser owed approximately $2.6 million under the Payment Plans, of which approximately $800,000 in payments was delinquent.

56.     On January 19, 2022, Debtors and their Boards of Directors (the "***Board***") sent a letter to Purchaser demanding that Purchaser cure all breaches under each of the Payment Plans and maintain compliance with such obligations while Debtors and Purchaser discuss a path forward in good faith (the "***Notice of Defaults***").  The Notice of Defaults also cautioned that any party taking part in any diversion or distribution of assets from Purchaser to any affiliates of

Weinshanker should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity is having its assets diminished or "wound down" for the benefit of insiders.

57.     In the Notice of Defaults, Debtors reminded Purchaser that pursuant to Section 2.6(a)(iii) of the Purchase Agreement, Purchaser's performance of its Sales Tax Funding Commitment obligations was ***and continues to be*** a material component of the "Purchase Price." Specifically, the Notices of Default stated:

> Moreover, anyone taking part in any diversion or distribution of assets from [Purchaser] to any affiliates of Mr. Weinshanker or NECA should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity that is having its assets diminished or "wound down" for the benefit of insiders, as Mr. Weinshanker indicated is occurring.

58.     Debtors further noted that Section 7 of the Sales Tax Funding Commitment  was not intended to (nor does it) absolve Purchaser from its payment obligations under the Purchase Agreement and Weinshanker or his affiliates or constituents from fraud, fraudulent transfers, or asset stripping while transferring Purchaser's assets and/or business to affiliates to prevent Debtors and other Purchaser creditors from seeking redress.

### The Current Status of Purchaser, and Loot ABC

59.     Debtors are informed and believe that approximately $30 million of billings ran through Purchaser in 2021.

60.     Debtors are informed and believe that, on average, Purchaser had $2 million of billings per month in the second half of 2021.

61.     Debtors are informed and believe that as of January 2022, Purchaser had approximately 60,000 active subscribers.

62.    Debtors are informed and believe that as of January 26, 2022, Purchaser was still the merchant of record for customer credit card billings with Stripe, PayPal and Amazon.

63.    Debtors are informed and believe that the total outstanding obligations under the Payment Plans is approximately $2.6 million, with at least $800,000 in default as of December 31, 2021.

64.    As of the time of the original complaint in this matter, Debtors were informed and believed that Purchaser was terminating the employment of various of its employees and advising them that Purchaser was "dissolving."   However, Purchaser also acknowledged to at least one terminated employee that Purchaser's e-commerce and subscription business would continue to operate through Purchaser's sister companies.

65.    As noted above, on or about February 2, 2022, contemporaneously with the filing of this Adversary Proceeding, Purchaser commenced an assignment for the benefit of creditors (the "***ABC***").

66.    Loot ABC is the assignee in the ABC matter.

67.    Loot ABC succeeded to any rights and claims held by Purchaser against Debtors. This includes whatever claims Money Chest has or may have had under the First Lien Loan Agreement, to the extent Money Chest is in fact or in practice the same entity as Purchaser.  This also includes whatever claims Money Chest has or may have had under its original subordinated note, owed by Debtors, to that same extent.  This also includes the Claim for D&O Litigation Proceeds, to which such claims were converted under the Term Sheet Order.

## COUNT I
### Breach of Contract against Purchaser – Asset Purchase Agreement

68.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

69.     Plaintiffs and Purchaser are parties to the Purchase Agreement, which is a valid contract.

70.     Pursuant to the Purchase Agreement, Purchaser agreed to pay the Purchase Price in exchange for substantially all of Plaintiffs' assets.

71.     The Purchase Price included, among other things, the following: (i) $30 million payable in the form of a credit bid; (ii) a cash component described as the Budgeted Reserve; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]." *See* Purchase Agreement § 2.6(a).

72.     As a condition to closing and in order to satisfy the third component of the Purchase Price, Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment. *See* Purchase Agreement §8.5(e).

73.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

74.     The Purchase Agreement is a binding contract that imposed the Sales Tax Funding Commitment obligations on Purchaser.

75.     Purchaser fulfilled the first two obligations of the Purchase Price.

76.     Purchaser failed to perform the third obligation of the Purchase Price and thus has failed to fully perform its obligations under the Purchase Agreement and the Sales Tax Funding Commitment obligations by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

77.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

78.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

79.     As a result of the material breaches of the Purchase Agreement, Plaintiffs have suffered damages in an amount to be proven at trial.  On information and belief, Plaintiffs' damages will exceed $3.5 million, which includes expenses, costs, and past due sales tax payments.

COUNT II
**Breach of Contract against Purchaser – Sales Tax Funding Commitment**

80.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

81.     Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.

82.     The Sales Tax Funding Commitment is a valid contract that requires Purchaser fund, directly or indirectly, the payments due under the Payment Plans.

83.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

84.     Purchaser failed to fully perform its obligations under the Sales Tax Funding Commitment obligations by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

85.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

86.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

87.     As a result of the material breaches of the Sales Tax Funding Commitment, Plaintiffs have suffered damages in an amount to be proven at trial.  Debtors are informed and believe that Plaintiffs' damages will exceed $3.5 million, which includes expenses, costs, and past due payments owed under the Payment Plans.

COUNT III

**Breach of Contract against Purchaser – Sales Tax Funding Commitment**

88.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

89.     As a condition to closing and in order to satisfy a component of the Purchase Price, Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.

90.     The Sales Tax Funding Commitment is a valid contract that requires Purchaser fund, directly or indirectly, the payments due under the Payment Plans.

91.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

92.     Purchaser failed to fully perform its obligations under the Sales Tax Funding Commitment obligations by failing to provide evidence of payments made to each of the state taxing authorities pursuant to the Payment Plans, even after Debtors demanded such written documentation evidencing payments were made.

93.     As a result of the material breaches of the Sales Tax Funding Commitment, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT IV

**Specific Performance against Purchaser**

94.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

95.     Plaintiffs and Purchaser are parties to the Purchase Agreement and the Sales Tax Funding Commitment.

96.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the sales Tax Funding Commitment, which are valid contracts.

97.     Purchaser failed to perform the third obligation of the Purchase Price and thus has failed to fully perform its obligations under the Purchase Agreement and the Sales Tax Funding Commitment by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

98.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

99.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

100.    The conduct of Purchaser, as described above, constitutes material and uncured breaches of the express terms of the Purchase Agreement and Sales Tax Funding Commitment.

101.    The parties to the Sales Tax Funding Commitment expressly agreed that Plaintiffs are "entitled to seek specific performance against [Purchaser] to cause [Purchaser] to satisfy its obligations [there]under." Sales Tax Funding Commitment § 4.

102.     Furthermore, it is patently inequitable for Purchaser to retain the benefit of the bargain without performing its obligations under the Sales Tax Funding Commitment.

103.     Purchaser should, therefore, be required to specifically perform its obligations under the Sales Tax Funding Commitment, including its obligations to pay all past-due and future installments owing under each Payment Plan.

104.     Under the terms of the Sales Tax Funding Commitment, Plaintiffs are entitled to an award of costs and expenses incurred in prosecuting this action.

COUNT V
**Equitable Subordination Against Purchaser and Loot ABC**

105.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

106.     Pursuant to Section 510(c) of the Bankruptcy Code, a court may, under principles of equitable subordination, subordinate all or part of an allowed claim to all or part of another allowed claim or interest.

107.     Purchaser knew of the breach of the Sales Tax Funding Commitment obligations as early as May 2021 with respect to the state of Texas.

108.     Purchaser did not disclose this breach to Debtors.

109.     Debtors relied on their belief that Purchaser was continuing to perform under the Sales Tax Funding Commitment and continued to pursue the D&O Litigation, of which some of the proceeds will benefit (or now, would have formerly benefitted) Purchaser or Loot ABC, and did not enforce specific performance rights against Purchaser pursuant to the Sales Tax Funding Commitment in such reliance.

110.    Upon notification of the Texas Default on November 18, 2021, Purchaser prolonged the façade that other payments were being made pursuant to the Sales Tax Funding Commitment.

111.    In fact, Purchaser intentionally mislead Debtors by stating, "Long story short is that there has been a lot of turnover at the company over the past months.  Ruby is no longer there and I don't think everything got communicated that should have before she left.  **They are working to become current and I will follow up next week as well**"  This statement was made even though Purchaser had no intention of becoming current on the past-due payments owed to Texas.

112.    Not until December 2021 did Purchaser acknowledge that there may have been a default in payments under the Texas Payment Plan; however, at no point did Purchaser give notice to Debtors of any other breaches.

113.    The actions of Purchaser, as described above, constitute unfair and inequitable conduct.

114.    Loot ABC, as assignee of the claims of Purchaser against Debtor, including the Claim for D&O Litigation Proceeds, must step into the shoes of its assignor.  If its assignor, Purchaser, acted inequitably to create this Count, then Loot ABC cannot whitewash any rights it has by virtue of taking the assignment of Purchaser's assets.

115.    Moreover, such inequitable conduct by Purchaser has harmed creditors of Debtors, including Debtors' general unsecured creditors.  Assuming the Payment Plan breaches are not cured, any proceeds from the D&O Litigation will first be applied to satisfy the outstanding priority tax claims that Purchaser was supposed to satisfy as part of the Purchase Price, many of which are likely to be priority claims under Section 507(a)(8) of the Bankruptcy Code.  Such additional priority obligation are likely to significantly reduce any distribution to general unsecured creditors.

116.    Also, the pre-assignment stripping of assets of Purchaser is both highly inequitable and threatens to render a judgment in favor of Plaintiffs for damages an inadequate legal remedy.

117.    Such inequitable conduct has also provided an unfair advantage to Purchaser, which received Debtors' assets for less than the bargained-for Purchase Price and may otherwise, but for this Adversary Proceeding and the breaches of the Term Sheet Order, receive its ratable share of the D&O Litigation via Purchaser's acquisition of the proceeds of the D&O Litigation, or now via Purchaser's (and now Loot ABC's) Claim for D&O Litigation Proceeds.

118.    The balance of equities clearly weigh in Plaintiffs' favor because the failure to make the payments pursuant to the Payment Plans does not solely result in monetary damages; instead, a breach of the Payment Plans could also lead to personal liability of certain officers and directors of Debtors.

119.    As noted above, at various times before and since the Sale of Debtors' assets to Purchaser, it appeared that either (i) Purchaser and its affiliates treated Purchaser as the holders of Money Chest's claims against Debtors, or (ii) Purchaser's counsel, which also represented Money Chest, conflated Purchaser and Money Chest (or ignored any legal or practical difference between them) such that the Money Chest claims are either owned by Purchaser, owned jointly by Purchaser and Money Chest, or had been transferred to Purchaser.

120.    In addition, the Claim for D&O Litigation Proceeds (as well as the original right to proceeds of the D&O Litigation, under the Purchase Agreement) is a claim against property of Debtors.  The D&O Litigation claims are owned by Debtors.  *See* Purchase Agreement § 2.1(u). A claim against property of a debtor is a claim against a debtor.  *See* 11 U.S.C. § 102(2).  As such, this claim as well (again, to the extent it remains, despite Purchaser's breach of the Sale Agreement, and the Term Sheet Order and the term sheet), is subject to equitable subordination.

121.    As noted above, Loot ABC is the holder of the Claim for D&O Litigation Proceeds. Indeed, both Loot ABC has stated this, and Purchaser has confirmed it.

122.    Pursuant to Section 510(c) of the Bankruptcy Code, any claims of Purchaser, whether held by it or held by Loot ABC, should be subordinated to the claims of other creditors in Debtors' Bankruptcy Cases.

## COUNT VI
## Fraud Against Purchaser

123.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

124.    Purchaser knew of the breach of the Sales Tax Funding Commitment obligations since May 2021.

125.    Purchaser intentionally did not disclose this breach to Debtors.

126.    Upon Debtors' notification of the Texas Default, Purchaser falsely represented to Debtors that "**[Purchaser is] working to become current and I will follow up next week as well**" This statement was made even though Purchaser had no intention of becoming current on the past-due payments owed to Texas.

127.    Purchaser knew that its statement that it was working to become current on the Texas Payment Plan was false.

128.    Purchaser intended Debtors to rely on its statement that it was working to become current on the Texas Payment Plan.

129.    Plaintiffs relied upon Purchaser's false statement that it was working to become current on the Texas Payment Plan by relaying the false representation to Texas authorities and continuing not to take any actions to specifically enforce Debtors' rights under the Purchase

Agreement and Sales Tax Funding Commitment.   Plaintiffs' reliance upon Purchaser's representation was reasonable and justifiable.

130.    Plaintiffs have incurred damages as a result of their reliance on Purchaser's false representation.

131.    Purchaser's actions were undertaken with malice, moral turpitude, and wantonness.

132.    Accordingly, Plaintiffs are entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

COUNT VII
**Unjust Enrichment Against Purchaser and Loot ABC**

133.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

134.    Plaintiffs conferred a benefit upon Purchaser by transferring substantially all of their assets to Purchaser in exchange for Purchaser's agreement to pay the Purchase Price. Additional benefits were conferred on Purchaser when Debtors agreed to defer payment of the sales-tax portion of the Purchase Price by allowing Purchaser to satisfy it over time and when Debtors have pursued the D&O Litigation, of which some of the proceeds will benefit Purchaser.

135.    Purchaser's breach of the Sales Tax Funding Commitment and its attempt to abandon its Purchase Price obligation while retaining the full benefit of Debtors' assets and business opportunities and transferring assets and operations to its affiliates, violate fundamental principles of justice, equity, and good conscience, and Purchaser equitably ought to compensate Plaintiffs for the benefits conferred upon it.

136.    Unless Purchaser is required to compensate Plaintiffs for the benefits conferred upon it, Purchaser will be unjustly enriched at the expense of Plaintiffs.

137.    Moreover, the Term Sheet Order imposed various obligations on Purchaser, and conferred enormous **potential** financial benefits on Purchaser.

138.    Specifically, Purchaser could recover a great deal, if it had funded the costs of the D&O Litigation as required by the Term Sheet Order.

139.    The term sheet attached to the Term Sheet Order is, by its terms, binding.

140.    Neither Debtors nor Committee are in breach of the term sheet attached to the Term Sheet Order.

141.    Purchaser failed to fund the costs of the D&O Litigation as required by the Term Sheet Order.

142.    To date, Loot ABC has also not funded the costs of the D&O Litigation.

143.    In addition, by failing to honor the Sales Tax Funding Commitment, Purchaser has made confirmation of a plan in this case – assuming there are D&O Litigation proceeds – substantially harder and more expensive, if the underlying tax claims are priority claims against Debtors.

144.    In this context, even aside from the breach of the Sales Tax Funding Commitment, the breach of the Term Sheet Order would, if Purchaser or Loot ABC still obtained any recovery on the Claim for D&O Litigation Proceeds.

145.    In other words, Purchaser and Loot ABC are treating the Term Sheet Order as a lottery ticket, purchased using non-recourse credit.  If the ticket wins, then they can cover their obligations under the Term Sheet Order, but if the ticket is worthless, then they simply point to their empty pockets when it comes to their obligations under the Term Sheet Order, the Purchase Agreement, and the Sales Tax Funding Commitment.

146.    Plaintiffs are entitled to an order of this Court requiring Purchaser, and Loot ABC, to compensate Plaintiffs for the benefits conferred upon them, in an amount to be determined at trial.

## COUNT VIII
### Avoidance of Transfers to John Doe

147.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

148.    Purchaser's transfer of assets to one or more of its affiliates (the "*Transfers*") is fraudulent under Section 1304 of Title 6 of the Delaware Code (the "*Delaware Code*")

149.    Purchaser made the Transfers with actual intent to hinder, delay, and/or defraud Debtors, in particular in their ability to enforce its specific performance rights or to recover damages under the Sales Tax Funding Commitment.

150.    Alternatively, Purchaser made the Transfers without receiving reasonably equivalent value in exchange for the Transfers, and at the time of the Transfers Purchaser was insolvent, was rendered insolvent, or was engaged in a business for which its remaining assets were unreasonably small.

151.    Alternatively, Purchaser made the Transfers to an insider for an antecedent debt, Purchaser was insolvent at the time, and the insider had reasonable cause to believe that Purchaser was insolvent at the time.

152.    At all relevant times, Plaintiffs were creditors of Purchaser holding claims within the meaning of Section 1301 of the Delaware Code.

153.    Accordingly, the Transfers should be avoided as fraudulent in accordance with Section 1307 of the Delaware Code.

## COUNT IX
### Recovery of Avoided Transfers from John Doe

154.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

155.    Plaintiffs are entitled to recover, for the benefit of their estates, the property included in the Transfers from the initial transferee of the Transfers or the entity for whose benefit the Transfers were made.

## COUNT X
### Setoff, against Purchaser and Loot ABC

156.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

157.    Purchaser did not make all required payments under the Sales Tax Funding Commitment.

158.    Loot ABC has made no payments under the Sales Tax Funding Commitment.

159.    Purchaser did not fund the required litigation expenses under the Term Sheet Order.

160.    Loot ABC has not funded the required litigation expenses under the Term Sheet Order.

161.    These failures have caused Debtors and their estates monetary damages, including the costs of this action (including legal fees), and the eventual amounts due to the taxing authorities that Purchaser was to pay.

162.    As set forth above, Purchaser's breaches and Loot ABC's breaches excuse further performance by Debtors under the Sale Agreement, and eliminates Purchaser's or Loot ABC's rights under the Sale Agreement.  This includes, to the extent such rights are not replaced by the

term sheet and the right to recovery on account of the Claim for D&O Litigation Proceeds, any rights to the proceeds of the D&O Litigation.

163.    But in the alternative, if Purchaser is entitled to any recovery through the proceeds of the D&O Litigation or on account of the Claim for D&O Litigation Proceeds, Debtors may set off against such recovery its claims against Purchaser as set forth above.

164.    If Loot ABC is entitled to any recovery through the proceeds of the D&O Litigation or on account of the Claim for D&O Litigation Proceeds, Debtors may set off against such recovery its claims against Purchaser as set forth above.  Loot ABC cannot take an assignment of a claim potentially owed by a party (here, Debtors), but disavow or cleanse that claim from setoff rights arising from amounts owed to that party.

165.    Plaintiffs are entitled to recover, for the benefit of their estates, any and all amounts owed to them for the matters above, against any amounts to which Purchaser or Loot ABC would be entitled for the Claim for D&O Litigation Proceeds.

COUNT XI
**The Remedy of Constructive Trust**

166.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

167.    A constructive trust is an equitable remedy whereby the court determines whether, due to a defendant's wrongdoing, equitable title to property properly lies in the plaintiff and, if so, deems the defendant to have been simply holding the property as a constructive trustee for the plaintiff.

168.    A claim for imposition of a constructive trust requires a showing that (i) there was an enrichment; (ii) an impoverishment; (iii) a relation between the enrichment and the

impoverishment; (iv) the absence of justification; and (v) the absence of a remedy provided by law.

169.    In this case, Purchaser's failure to honor the Sales Tax Funding Commitment enriched Purchaser.

170.    Likewise, Purchaser's failure to honor the term sheet, by failing to fund the litigation expenses required of it, enriched Purchaser.

171.    Loot ABC, as assignee of all or substantially all of Purchaser's assets, was likewise enriched, as its collection of assets was greater than it would have been had Purchaser paid the amounts it was required to pay.

172.    Debtors' estate was impoverished by these same amounts.  Debtors estate is now burdened with greater tax liabilities than they would have had.  Likewise, Debtors and the Committee are in the process of finding another source to cover the costs of the D&O Litigation.

173.    The enrichment and the impoverishment are related – the term sheet was the basis for a liquidating plan, and it contemplated the performance of Purchaser, and the reward of Purchaser from a portion of the D&O Litigation proceeds.  Likewise, the tax payment Purchaser was to pay would have possibly allowed for a liquidating plan (by relieving Debtors' estates of priority claims), and such plan was then the subject of the term sheet.

174.    As such, Purchaser's breaches are completely intertwined with the damages being suffered by Debtors.

175.    Moreover, Purchaser, Committee, and Debtors were partners via the term sheet – each contributed something to the potential successful resolution of this case, and a return to all creditors, and the term sheet reflected a partnership among them, through a careful allocation of proceeds, obligations, and the like.

176.    Purchaser has provided no justification for its actions.  Indeed, Purchaser indicated that it simply would refuse to make the required tax payments, once it was confronted, and after Debtors were deceived through Purchasers' lawyers for some months.

177.    To the extent the remedies above do not make Debtors' whole, then a constructive trust exists as to Purchaser's assets, and such trust carries over to Loot ABC's assets (all of which were obtained from Purchaser).

### **Relief Requested**

WHEREFORE Plaintiffs demand judgment in their favor and request the following relief:

(a)    Entry of a decree of specific performance of Purchaser's obligations under the Sales Tax Funding Commitment, including reimbursement of Plaintiffs' costs and expenses incurred in bringing this action, and requiring pre-funding of an escrow for use in paying the remaining payments for the Payment Plans;

(b)    In the alternative, entry of a judgment for money damages in an amount to be proven at trial, or a finding that Purchaser's and Loot ABC's breaches render them not entitled to the benefit of their bargain in respect of any proceeds of the D&O litigation, including any recovery on the Claim for D&O Litigation Proceeds;

(c)    Entry of a decree equitably subordinating Purchaser's or Loot ABC's Claims and extinguishing their right to any proceeds of the D&O Litigation, including any recovery on the Claim for D&O Litigation Proceeds;

(d)    Entry of a judgment avoiding the Transfers and directing recovery of the associated assets for the benefit of Debtors and their estates;

(e)    Entry of a judgment authorizing Debtors to setoff any amounts to which Purchaser or Loot ABC would be entitled from the D&O Litigation, including any recovery on the Claim for D&O Litigation Proceeds, against the claims held by Debtors for the causes of action above;

(f)    Imposition of a constructive trust on the assets of Purchaser and Loot ABC; and

(g)    such other and further relief as is just.

*[This space left intentionally blank.]*

Dated: March 21, 2022

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Mark I. Duedall*

Mark I. Duedall (No. 3346)
Brian C. Walsh (*Admitted pro hac vice*)
Leah Fiorenza McNeill (*Admitted pro hac vice*)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
       Brian.walsh@bclplaw.com
       leah.fiorenza@bclplaw.com

**BRYAN CAVE LEIGHTON PAISNER LLP**

Andrew J. Schoulder (*Admitted pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile:  (212) 541-4630
Email: andrew.schoulder@bclplaw.com

-and-

**ROBINSON & COLE LLP**

Natalie D. Ramsey (No. 5378)
Jamie L. Edmonson (No. 4247)
Mark A. Fink (No. 3946)
1201 North Market Street
Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile:   (302) 516-1699
Email: nramsey@rc.com
       jedmonson@rc.com
       mfink@rc.com

*Co-Counsel to Plaintiffs*

## **EXHIBIT A**

**Sales Tax Funding Commitment**

STRICTLY CONFIDENTIAL

Loot Crate Acquisition LLC
603 Sweetland Avenue
Hillside, NJ 07205

October 1, 2019

Loot Crate, Inc.
Loot Crate Holdings, Inc.
LC Funding, Inc.
Loot Crate Parent, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031-1929
Attention: Stuart Kaufman

Re:    Sales Tax Funding Commitment

Ladies and Gentlemen:

Reference is hereby made to that certain Amended and Restated Asset Purchase Agreement, dated as of September 27, 2019 (the "**Purchase Agreement**") by and among Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc. and Loot Crate Parent, Inc. (collectively, the "**Sellers**"), and Loot Crate Acquisition LLC ("**Purchaser**"). This letter agreement (this "**Agreement**") sets forth the commitment of Purchaser, subject to the terms and conditions hereof, to make certain payments on behalf of the Sellers to the applicable Taxing Authorities under the Payment Plans in accordance with Section 8.5 of the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

1.    Upon the terms and subject to the conditions set forth herein, concurrently with the Closing, Purchaser hereby commits to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment obligations of the Sellers and any Successor Entity (each, a "**Seller Entity**" and collectively, the "**Seller Entities**") arising in the states listed on <u>Appendix A</u> attached hereto (the "**States**") as such individual payments become due under the Payment Plans attached hereto as <u>Appendix B</u> (as updated from time to time after the date hereof in accordance with the Purchase Agreement and this Agreement) entered into by the applicable Seller Entities with the Taxing Authorities of the States (collectively, as updated from time to time in accordance with the Purchase Agreement and this Agreement, the "**Sales Tax Funding Commitment**"); <u>provided</u>, <u>however</u>, that Purchaser shall have no obligation to fund, directly or indirectly, any amounts upon the termination of this Agreement other than Defaulted Payments. Upon the finalization of each Post-Closing Payment Plan after the Closing in accordance with Section 8.5 of the Purchase Agreement, <u>Appendix B</u> hereto will be updated to include such Post-Closing Payment Plan, and this Agreement will then cover such payment obligations.

2.    Purchaser shall make Sales Tax Funding Commitment payments under a Payment Plan either, in Purchaser's discretion (unless an applicable State directs otherwise), directly to the applicable State Taxing Authority or to the applicable Seller Entity for its payment to the

applicable State Taxing Authority in accordance with the Payment Plan; <u>provided</u> that with respect to any payments made by Purchaser directly to a State Taxing Authority, Purchaser shall provide to the Seller Entities written documentation evidencing such payment was made.

    3.    This Agreement shall terminate, automatically and without any need for any action by any Person, upon the earliest to occur of the following:

    (a)    Purchaser's establishment of a Material Breach as follows:

    i.    On or before (x) February 29, 2020 (i.e., 60 days after December 31, 2019) in the event that the Closing under the Purchase Agreement occurs on or before October 1, 2019 or (y) the date that is on the six-month anniversary of the Closing in the event that the Closing occurs after October 1, 2019 (the date of the applicable notice deadline, the "**Notice Date**"), Purchaser shall have (A) delivered written notice with reasonable detail (it being agreed, however, that any claim by Sellers regarding any alleged lack of reasonable detail shall not be grounds for disqualifying any notice provided on or before the Notice Date) to the Seller Entities describing (I) the material inaccuracies in the financial information listed on <u>Schedule I</u> attached hereto and made available to Purchaser prior to the Closing in the Merrill Data Site folder titled "2 Financial" (the "**Financial Data**") or (II) the material breaches of, the Sellers' representations and warranties set forth in Section 3.3 of the Purchase Agreement, that have caused a "Material Adverse Effect" (as defined below) ((I) or (II), a "**Material Breach**"), and (B) deposited, by wire transfer of immediately available funds, an amount equal to $150,000 in a reserve account designated by the Seller Entities to fund certain costs and expenses as set forth herein (the "**Fee Reserve**").

    ii.    Purchaser shall establish a Material Breach has occurred by obtaining, at its election, either (A) an entry of a final judgment by the Bankruptcy Court, which shall have exclusive jurisdiction with respect thereto (the "**Material Breach Order**"), or (B) a final determination by Sheila Enriquez of Briggs & Veselka Co. (the "**Independent Auditor**") upon review of the Financial Data and related materials reasonably requested by the Independent Auditor to make such determination.  In the event Purchaser elects to seek a Material Breach Order, each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. The Parties acknowledge and agree that in the event Purchaser elects to seek a determination by an Independent Auditor, any determination by the Independent Auditor shall be final, binding and non-appealable and non-reviewable.

    iii.    The Seller Entities shall use the funds in the Fee Reserve to pay all costs and expenses arising from either the Seller Entities' Representatives (in the event Purchaser elects to obtain a Material Breach Order) or the Independent Auditor, including, without limitation, promptly funding a retainer for the Independent Auditor

(the "**Establishment Costs**").  In the event Purchaser is unable to establish a Material Breach, Purchaser shall (A) reimburse the Seller Entities for all additional Establishment Costs in excess of $150,000 and (B) be responsible for any additional interest or penalties payable under the Payment Plans, in excess of the Fee Reserve.  The unused portion of the Fee Reserve, if any, shall be promptly paid to Purchaser.

       iv.    For the avoidance of doubt, (A) the obligations of Purchaser to fund the Sales Tax Funding Commitment shall continue unless and until Purchaser has established a Material Breach in accordance with the terms hereof; (B) any failure by Purchaser to fund amounts due to the Taxing Authorities under the Sales Tax Funding Commitment prior to Purchaser's establishment of a Material Breach shall constitute a material default by Purchaser under this Agreement ("**Defaulted Payments**"); and (iii) if a Material Breach is established by Purchaser, Purchaser shall remain liable for and satisfy any portion of the Sales Tax Funding Commitment that came due and remains unpaid prior to the establishment of the Material Breach as a condition to the effectiveness of this Section 3(a).

       v.    For purposes of this Agreement, a "**Material Adverse Effect**" means any material adverse effect on the Purchased Assets or the Business; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect:  (A) changes in general business or economic conditions affecting the industry in which the Sellers operate the Business, (B) changes in national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (C) changes in, GAAP after the date hereof, (D) changes in applicable Laws after the date hereof, (E) changes resulting from the public announcement of this Agreement or the Transactions, (F) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance of doubt, the underlying causes of any such failure), (G) changes to the extent resulting from the actions or omissions of Purchaser after the Closing Date with respect to the Purchased Assets or the Business, (H) any event, change, occurrence, circumstance, development or effect resulting from any action with respect to which the Sellers obtained the consent of the DIP Lender to take, and (I) any increase in subscriber churn, reduction in new sign ups or loss or non-assignment of vendor/licensor relationships to the extent caused by (1) a reduction in marketing spend from and after the filing of the Bankruptcy Cases, (2) the announcement or filing of the Bankruptcy Cases, (3) any action taken by Sellers with the prior written consent of Purchaser or with due care and in accordance with the directions of Purchaser pursuant to the Purchase Agreement or Transition Services Agreement or (4) any action not taken by the Sellers (x) at Purchaser's written request or (y) as a result of Purchaser's refusal to grant consent to such action after Sellers' written request pursuant to the Purchase Agreement or Transition Services Agreement.

(b)      the date that any Seller Entity or any of their Representatives (i) asserts in any Action, litigation or other proceeding (x) that one or more of the provisions in Section 7 of this Agreement are illegal, invalid or unenforceable in whole or in part, (y) that Purchaser has any liability under this Agreement other than to fund cash payments (including penalties and interest with respect to any Defaulted Payments) with respect to the Sales Tax Funding Commitment in accordance with the Payment Plans or (z) any claim or theory of liability against the Non-Recourse Parties (as defined below) relating to this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement or (ii) asserts, or threatens to assert, any claim against a Non-Recourse Party (as defined below) in connection with this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement (including in respect of any oral representations made or alleged to be made in connection therewith), whether in any Action, litigation or other proceeding, through counsel or in any other way; and

(c)      the date that Purchaser has fulfilled its payments obligations under Section 1 of this Agreement (including penalties and interest with respect to any Defaulted Payments).

4.      The Seller Entities shall be entitled to seek specific performance against Purchaser to cause Purchaser to satisfy its obligations hereunder, with the costs and expenses of the Seller Entities in seeking such relief being an obligation of the Purchaser.

5.      Each party hereto acknowledges and agrees that this Agreement is not intended to, and does not, create any agency, partnership, fiduciary or joint venture relationship between or among any of the Parties hereto and neither this Agreement nor any other document or agreement entered into by any Party hereto relating to the subject matter hereof shall be construed to suggest otherwise.

6.      Purchaser acknowledges and agrees that this Agreement may be assigned by the Sellers to the Successor Entity in connection with the Successor Entity's assumption from the Sellers of all Liabilities arising from Pre-Petition Sales Taxes and the Payment Plans.  Upon such assignment, this Agreement shall inure to the benefit of the Successor Entity and shall be enforceable by the Successor Entity as if it was the Sellers under this Agreement.

7.      Notwithstanding anything that may be expressed or implied in this Agreement or any document or instrument delivered in connection herewith or otherwise, each of the Sellers, by its acceptance of the benefits hereof, covenants, agrees and acknowledges for itself and its Affiliates, and any Person claiming on its or their behalf, from time to time (including, without limitation, the Seller Entities), that no person other than Purchaser has any liabilities, obligations or commitments of any nature (whether known or unknown, whether due or to become due, absolute, contingent or otherwise) hereunder (in each case subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that, notwithstanding that Purchaser is a limited liability company, no Person other than Purchaser shall have any obligation hereunder or under any document or instrument delivered in connection herewith, against, or any claim (whether in bankruptcy, tort, contract or otherwise) based on, in respect of, or by reason of, this Agreement or arising out of or in connection with the transactions

4

contemplated hereby, and that no recourse hereunder or under any documents or instruments delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, and no personal liability with respect thereto shall attach to, be imposed upon or otherwise be incurred by (a) any former, current or future equity holder, controlling person, director, officer, employee, agent, Affiliate, member, manager, general or limited partner, Representative or successor or assignee of Purchaser or (b) any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, Representative or successor or assignee of the foregoing (such Persons, collectively, but excluding Purchaser, the "**Non-Recourse Parties**"), whether by or through attempted piercing of the corporate veil, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law. Notwithstanding anything to the contrary in this Agreement, this Section 7 shall survive the termination and expiration of this Agreement.

8.     None of the Sellers may assign or delegate its rights, interests or obligations under this Agreement (by operation of law or otherwise) to any other Person (other than a Successor Entity or Bankruptcy Successor in accordance with Section 6) without the prior written consent of Purchaser.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including with respect to the Sellers, any chapter 7 trustee, plan administrator, trustee of a liquidating trust, or other successor arising from the pendency of the Bankruptcy Cases.   Any purported assignment of this Agreement in contravention of this Sections 6 and 8 shall be null and void.

9.     The directors and officers listed on Schedule II hereto will be express third party beneficiaries of this Agreement if and to the extent (and solely to the extent) that such person seeks specific performance of Purchaser's obligation to fund a payment in respect of the Sales Tax Funding Commitment, in each case, if and only to the extent permitted by, and subject to the limitations set forth in, the next sentence and for no other purpose (including, without limitation, any claim for monetary damages hereunder).  In the event that (i) Purchaser fails to timely fund a payment required to be made under the Sales Tax Funding Commitment and (ii) Purchaser fails to cure such failure within ten (10) Business Days of written notice from an officer or directed listed on Schedule II, then the directors and officers listed on Schedule II shall be entitled to seek specific performance of Purchaser's obligation to fund such payment under Section 1 of this Agreement.  Except for the directors and officers listed on Schedule II (pursuant to the first two sentence of Section 9 of this Agreement) and the Non-Recourse Parties (pursuant to Section 7 of this Agreement) and any rights assigned to a permitted assignee (pursuant to Sections 6 and 8 of this Agreement), no Person shall be entitled to rely upon this Agreement, and this Agreement shall be binding upon and inure solely to the benefit of each Party hereto and nothing herein or in any other agreement (including, without limitation, the Purchase Agreement), express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies whatsoever under or by reason of this Agreement.

10.     Sections 12.1 (Notice), 12.2 (Waivers), 12.4 (Governing Law) and 12.5 (Jurisdiction) shall apply to this Agreement and are incorporated herein by reference.

11.    This Agreement constitutes the entire agreement, and supersedes any and all prior or contemporaneous agreements (other than the Purchase Agreement), whether written or oral, with regard to the subject matter herein.    Notwithstanding the foregoing, this Agreement is subject in all respects to the terms and conditions of the Purchase Agreement and nothing herein, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms, representations and warranties or covenants contained in the Purchase Agreement.    No amendment, modification or waiver of any of the provisions of this Agreement will be valid unless set forth in a written instrument signed by the party to be bound.    An executed copy of this Agreement may be delivered by means of a facsimile machine or other electronic transmission (including .pdf., tif, .gif, .jpeg or similar attachment to electronic mail files), and shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*       *       *       *       *

If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____
Name: Joel Weinshanker
Its:   Sole Member


SELLERS:

Loot Crate, Inc.

By: _____
Name:
Its:

Loot Crate Holdings, Inc.

By: _____
Name:
Its:

LC Funding, Inc.

By: _____
Name:
Its:


Loot Crate Parent, Inc.

By: _____
Name:
Its:

If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____
Name: Joel Weinshanker
Its:   Sole Member


SELLERS:

Loot Crate, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer

Loot Crate Holdings, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer

LC Funding, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer


Loot Crate Parent, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer


*Signature Page to Sales Tax Funding Commitment Letter*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*,[6] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Old LC, Inc. (f/k/a Loot Crate, Inc.), Old | § | |
| LC Holdings, Inc., Old LCF, Inc., and | § | |
| Old LC Parent, Inc., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 22-50107 (BLS) |
| | § | |
| The Loot Company (f/k/a Loot Crate | § | |
| Acquisition LLC) and John Doe, | § | |
| | § | |
| Defendants. | § | |

## CERTIFICATE OF SERVICE

This is to certify that I have on this day electronically filed the *First Amended Complaint*

using the Court's CM/ECF filing system, which generated an email notice of the filing, linked to

this document, to the following parties:

| | |
|---|---|
| Erin R. Fay | Cathy Hershcopf |
| Steven D. Adler | Lauren A. Reichardt |
| Bayard, P.A. | Cooley LLP |
| 600 N. King Street, Suite 400 | 55 Hudson Yards |
| Wilmington, DE 19801 | New York, NY10001-2157 |

---

[6]     Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

Morris James
Jefferey R. Waxman
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

I further certify that on March 21, 2022, I caused a copy of the *First Amended Complaint*

to be served via electronic mail to the party listed below.

Ron Bender
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, CA 90034
Email: rb@lnbyg.com

Dated: March 21, 2022

**BRYAN CAVE LEIGHTON PAISNER LLP**

　　　*/s/ Mark I. Duedall*
Mark I. Duedall (No. 3346)
Leah Fiorenza McNeill *(Admitted pro hac vice)*
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
　　　leah.fiorenza@bclplaw.com

*Counsel to Plaintiffs*

604736388